Kevin **FRAZIER**, Plaintiff, Appellant,

v.

Edward N. **BAILEY**, et al.,
Defendants, Appellees.

No. 91–1477.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1991.

Decided Feb. 24, 1992.

Barbara A.H. Smith with whom Quinlan & Smith, Boston, Mass., was on brief, for appellant.

Kevin C. Giordano with whom Dennis R. Anti and Keyes and Donnellan, P.C., Springfield, Mass., were on brief, for Children's Aid and Family Service of Hampshire County, Inc. and Janice E. Stevens.

H. Gregory Williams with whom Brooks, Mulcahy, Sanborn & Williams, Springfield, Mass., was on brief, for Massachusetts Soc. for Prevention of Cruelty to Children and Stephanie Flinker.

William T. Walsh, Jr. with whom Pellegrini & Seeley, P.C., Springfield, Mass., was on brief, for Denise Gelinas.

Felicity Hardee with whom Francis D. Dibble, Jr., Christopher E. Grant and Bulkley, Richardson and Gelinas, Springfield, Mass., were on brief, for Edward N. Bailey.

Before TORRUELLA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This is an appeal from a grant of summary judgment on immunity grounds for defendants in a civil rights suit. Plaintiff-appellant Kevin Frazier alleges that defendant-appellees Edward Bailey, Denise Gelinas, Stephanie Flinker, Janice Stevens, the Children's Aid and Family Service of Hampshire County, Inc., and the Massachusetts Society for the Prevention of Cruelty to Children interfered with his constitutionally protected parental rights in violation of 42 U.S.C. § 1983. He also alleges that the defendants-appellees acted in violation of the Massachusetts Civil Rights Act ("MCRA") and other state law claims. We affirm the district court's grant of summary judgment.

## Standard of Review

■ Our review of a grant of summary judgment is plenary. *Calvary Holdings, Inc. v. Chandler,* 948 F.2d 59, 61 (1st Cir. 1991); *Amsden v. Moran,* 904 F.2d 748, 752 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). We, like the district court, must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990); *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). A summary judgment motion will only be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

We are not bound by the district court's reasoning. "Rather '[w]e are free, on appeal, to affirm a judgment on any indepen-

dently sufficient ground.'" *Garside*, 895 F.2d at 49 (quoting *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987)).

## Background

### A. *Family Background*

On February 20, 1982, Frazier married Jamie Fenelon Young. They had two children, Teresa, born January 8, 1982, and Dylan, born July 31, 1983. Frazier and Young separated in April of 1984. The probate court awarded Frazier temporary visitation rights during the summer which permitted him to visit the children on Sundays.

### B. *Alleged Abuse of Teresa/Alleged Neglect of Dylan*

Because of the bitter nature of the ongoing custody battle, Frazier arranged to visit the children only in the presence of others. After his visit on September 2, 1984, Young took Teresa to see Dr. Peter Kenny, the family pediatrician. Young informed Dr. Kenny that Frazier had abused Teresa during the September 2 visit. After Dr. Kenny examined Teresa he filed, on September 6, 1984, a report pursuant to Mass. Gen.Laws Ann. ch. 119, § 51A ("51A") with the Commonwealth of Massachusetts. Department of Social Services ("DSS").[1]

As required under Massachusetts law, DSS referred the case to Sheila Ryan, an employee investigator, to investigate and evaluate the charges. Mass.Gen.Laws Ann. ch. 119, § 51B.[2] After her investigation, Ryan concluded that there was reasonable cause to believe that Teresa had been sexually abused.

Meanwhile, on September 9, 1984, the children visited Frazier. During that visit, Frazier noticed that Dylan had a serious case of diaper rash and took him to the emergency room at Baystate Medical Center. There, both Dylan and Teresa were given a physical examination by Dr. Peter Plasse. Dr. Plasse concluded that neither child demonstrated any signs of physical or emotional abuse. Dr. Plasse determined, however, that Dylan's diaper rash indicated a serious case of child neglect. Dr. Plasse reported the child's condition to DSS, but this report was never the subject of an investigation.

### C. *Counselling of Teresa by Janice Stevens*

On September 12, 1984, Ryan referred Teresa's case to the Children's Aid and Family Service of Hampshire County (CAFS), a private agency with which DSS has an ongoing contractual relationship to provide counselling, pursuant to Mass.Gen. Laws Ann. ch. 119, § 51B.[3] CAFS as-

---

**1.** Mass.Gen.Laws Ann. ch. 119, § 51A states in pertinent part:

Any physician ... who, in his professional capacity shall have reasonable cause to believe that a child under the age of eighteen years is suffering serious physical or emotional injury resulting from abuse inflicted upon him including sexual abuse ... shall immediately report such condition to the department by oral communication and by making a written report within forty-eight hours after such oral communication. ...

**2.** Mass.Gen.Laws Ann. ch. 119, § 51B states in pertinent part:

The department shall:
(1) investigate and evaluate the information reported under section fifty-one A. Said investigation and evaluation shall commence within two hours of initial contact and be completed within twenty-four hours if the department has reasonable cause to believe the child's health or safety is in immediate danger from further abuse and neglect. Said investi-

gation and evaluation shall commence within two working days of initial contact and shall be completed within ten calendar days for all other such reports. The investigation shall include a home visit at which the child is viewed, if appropriate, a determination of the nature, extent and cause or causes of the injuries, the identity of the person or persons responsible therefor, the name, age and condition of other children in the same household, an evaluation of the parents and the home environment, and all other pertinent facts or matters.

**3.** It states in pertinent part:

The department shall:
(5) offer to the family of any child which it has reasonable cause to believe is suffering from any of the conditions described in the report appropriate social services to prevent further injury to the child, to safeguard his welfare, and to preserve and stabilize family life whenever possible.

signed Teresa's case to Janice Stevens, a licensed social worker and then Director of Counselling for CAFS. Stevens's sole function, in her own words, "was to counsel Teresa Frazier and Jamie Young. It was not my function to investigate the allegation of child abuse." Stevens counselled Teresa till July 1987, during which time over 100 play therapy sessions were conducted.

Frazier alleges that during the counselling sessions Stevens coached and programed Teresa to make false accusations of sexual abuse through the use of anatomically correct dolls. Further, Frazier alleges that Stevens improperly incorporated information given by Young in her session notes as "data" despite her awareness that Frazier and Young were in the midst of a bitter custody battle. Frazier claims that Stevens refused to meet with Dr. Plasse or other experts who had concluded that there had been no sexual abuse. Finally, Frazier asserts that Stevens refused to interview witnesses who were present during the September 2 visit during which the alleged abuse of Teresa took place.

### D. Referral to Denise Gelinas

In January of 1985 Stevens referred Teresa and Young to Dr. Denise Gelinas, a psychologist in private practice who specializes in the evaluation and treatment of sexual abuse and incest. Around this time Dr. Gelinas was also contacted by Susan Mossman, a state trooper assigned to the Hampden County District Attorney's Office, regarding the matter. On January 14, 1985, Young gave Dr. Gelinas permission to discuss "my contact and my daughter Teresa's situation and contact" with Trooper Mossman, Stevens, DSS, Ryan, and Young's attorney. In the course of her evaluation of Teresa, Dr. Gelinas engaged in telephone conversations with Trooper Mossman, Ryan, and Stevens.

In testimony Dr. Gelinas later gave the Hampden County grand jury, she stated that she had met with Teresa six times over a period of approximately three months, four of which were videotaped. Prior to the first interview, Dr. Gelinas met with Young to discuss relevant family background. During the sessions, Dr. Gelinas provided Teresa with anatomically correct dolls that Teresa used to demonstrate acts of masturbation and oral sex which Teresa attributed to her father.

In March of 1985, according to Dr. Gelinas, she met with Frazier at the behest of Trooper Mossman. At that meeting, according to Dr. Gelinas' later grand jury testimony, Frazier was unwilling to answer questions regarding the alleged abuse. According to Frazier, he paid sixty-five dollars to Dr. Gelinas for the visit.

On March 13, 1985, after the meeting with Frazier, Dr. Gelinas sent a five-page letter to a probation officer of the Hampshire County Probate Court where the Frazier divorce and custody case was pending. In that letter Dr. Gelinas stated that the "very strong conclusion is that Theresa [sic] has been sexually abused and that the person who is responsible is her father, Kevin Frazier." Also in that letter Dr. Gelinas spoke favorably of Young. On the other hand, Dr. Gelinas did note that Teresa had a strong loyalty and attachment to her father and that supervised visitations should be allowed to continue. Young, on March 19, gave written permission to Dr. Gelinas to send the report and cover letter to Trooper Mossman. In April of 1986 Dr. Gelinas testified under subpoena in front of a Hampden County grand jury regarding the abuse charges.

Frazier maintains that like Stevens, Dr. Gelinas ignored exculpatory evidence. Further, he asserts that Dr. Gelinas coached and programed Teresa so that the child would falsely accuse him of sexual abuse.

### E. Alleged Abuse of Dylan

Young, on February 13, 1986, brought the children for an examination with Dr. Christine Bartlett, an associate of Dr. Kenny, the family pediatrician. Young told Dr. Bartlett that Dylan had been molested by Frazier during a visit on February 9, 1986. Additionally, she said that Dylan had complained to his day care providers that Frazier had "hurt [Dylan's] wee-wee." Bartlett

examined Dylan and found no physical signs of abuse. She, nonetheless, reported the claimed sexual abuse of Dylan to the DSS pursuant to section 51A.

On February 14, 1986, Massachusetts State Police Trooper Denise Fisher videotaped Teresa's and Dylan's testimony at the Hampden County District Attorney's Office. At the videotaping the children gave information regarding alleged sexual abuse by Frazier.

That same day DSS assigned the Massachusetts Society for the Prevention of Cruelty to Children ("MSPCC") to investigate the alleged sexual abuse of Dylan, pursuant to section 51B. MSPCC, on February 18, 1986, assigned Dylan's case to Stephanie Flinker, a social worker employed at the agency.

Flinker began her investigation by contacting Dr. Bartlett and Trooper Mossman, the police officer involved in the earlier investigation of alleged sexual abuse of Teresa. Trooper Mossman informed Flinker that Trooper Fisher was also involved in the investigation of the abuse of both children. At that time Flinker also learned that the probate court had suspended Frazier's visitation rights pending a hearing on February 25, 1986.

During her investigation, Flinker also spoke to Young and the children in separate interviews. When interviewing the children she utilized anatomically correct dolls. Frazier alleges that they were used to coach and program the children so that they would make false sexual abuse charges against him. Flinker also viewed the videotape recorded by Trooper Fisher the previous week and interviewed Dylan's day care providers. Flinker further attempted to interview Frazier but claimed that she was unable to contact him. Frazier maintains that he was available for the interview and claims that Flinker acted improperly by ignoring exculpatory witnesses and by not interviewing Frazier's experts.

After being advised by the DSS that the investigation must be completed, Flinker, on February 21, substantiated the allegations of sexual abuse of Dylan and Teresa by Frazier. In her report to DSS she stated that "the children [were] at high risk of further abuse and at risk of further emotional trauma if they continue to have contact with their father."

On February 19, 1986, Frazier was arrested on criminal charges, supposedly as a result of the reports of Stevens, Dr. Gelinas, and Flinker.[4]

### F. *Examination of Children by Dr. Bailey*

On April 3, 1986, Young brought Teresa and Dylan to the Suspected Sexual Misuse Clinic ("Clinic") at the Baystate Medical Center, for an examination by the Clinic's director, Dr. Edward Bailey, in order to substantiate the suspected sexual abuse of the children. Dr. Bailey is a member of the Sexual Abuse Intervention Network, a multi-disciplinary team involving DSS, police, and the Hampden County District Attorney, established pursuant to Mass.Gen. Laws Ann. ch. 119, § 51D ("51D").[5] Ac-

---

4. There seems to be some confusion as to whether the plaintiff was actually arrested on February 19. In the complaint plaintiff alleges that he was arrested on that date. In his affidavit, however, he states that he was working on February 19 and 20 when Flinker attempted to contact him. Further, as explained below, plaintiff was not criminally indicted till May of 1986.

5. Mass.Gen.Laws Ann. ch. 119, § 51D states in pertinent part:

Each ... regional director [of the Department of Social Services] shall, in cooperation with the appropriate district attorney, establish one or more multi-disciplinary service teams to review the provision of services to children and their families who are the sub-

ject of such reports. Such teams shall each consist of one representative of the department who shall be the caseworker for the particular case, one representative of the appropriate district attorney, and at least one other member who is not an employee of either such office but shall be appointed by the regional director. The additional member shall have training and experience in the fields of child welfare or criminal justice and, as far as practicable, be involved in the provision of services to such families. No members of such team shall receive any compensation, or in the case of a state employee, any additional compensation, for service on such team.

Such team shall review and monitor the service plan developed by the department....

cording to Dr. Bailey, he believed that the case had been referred to him by Assistant District Attorney Bill Fennell at the Hampden County District Attorney's Office who had been assigned the case. After the session Dr. Bailey sent Frazier a bill of $100 for services rendered.

After examining and interviewing the children, Dr. Bailey did not find any physical evidence of sexual abuse. In his written evaluation, however, Dr. Bailey stated that the history as presented by Young suggested that the children were "sexually misused." Dr. Bailey stated that the children were "at risk with the father during unsupervised visitation." He concluded by suggesting that "well supervised supervision" was an appropriate response to the situation. Young signed a release requesting that Dr. Bailey send a copy of this evaluation to Assistant District Attorney Fennell of Hampden County. The report was sent there on April 14, 1986.

### G. Criminal Indictment Against Frazier

A Hampden County grand jury was convened to investigate the alleged sexual abuse charges against Frazier. In April 1986 Dr. Gelinas and Flinker were summoned before the grand jury. Flinker testified on both April 17, 1986, and May 6, 1986. Dr. Gelinas testified on May 6, 1986.

The grand jury returned indictments against Frazier charging him with having assaulted and battered and engaged in sexual intercourse with Teresa on or before September 6, 1984. The grand jury also charged Frazier with having assaulted and

battered Dylan on or before February 9, 1986. Frazier entered not guilty pleas and remained free on bail.

### H. Resolution of Criminal Charges and Custody Dispute

On October 30, 1986, just prior to a probate court trial to determine custody of the children, Young and Frazier settled their dispute. Frazier agreed to give up legal and physical custody of the children. Young, in turn, agreed to use her best efforts to get the criminal charges continued against Frazier if he complied with the probate court agreement.

Subsequently, the probate court appointed a psychiatrist, Dr. Ralph Cohen, to evaluate the degree of supervision necessary when the children visited Frazier. Cohen concluded that no supervision was necessary. Unsupervised visits have continued to the present.

On January 31, 1989, the criminal charges against Frazier were dismissed with prejudice.

### I. Civil Action

Frazier brought this suit three months later, pursuant to both 28 U.S.C. § 1343 and 28 U.S.C. § 1332. He alleged, pursuant to 42 U.S.C. § 1983, that defendants Stevens, CAFS, Dr. Gelinas, Flinker, and MSPCC interfered with his constitutionally protected parental relationship with his children.[6] He also alleged that these defendants violated the MCRA by interfering with his civil rights. Mass.Gen.Laws Ann. ch. 12, § 11H & 11I.[7] He claimed that

---

Such team shall evaluate such service plan in regard to its effectiveness in protecting the child from further abuse or neglect. Such team shall make recommendations regarding amendments to the service plan, the advisability of prosecuting members of the family, and the possibility of utilizing diversionary alternatives.

**6.** Though the complaint names CAFS and MSPCC as defendants, plaintiff makes no specific allegations against the agencies themselves but only against their respective employees, Stevens and Flinker.

**7.** Mass.Gen.Laws Ann. ch. 12, § 11H states in pertinent part:

Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate relief....

Mass.Gen.Laws Ann. ch. 12, § 11I states in pertinent part:

Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States or of rights secured by the

Stevens, CAFS, Flinker, and MSPCC intentionally inflicted emotional distress on him in their handling of the case. He also claimed that Stevens, CAFS, Flinker, MSPCC, and Dr. Bailey committed acts of negligence, gross negligence, and defamation. Finally, Frazier asserted that Stevens, CAFS, Flinker, MSPCC, and Dr. Gelinas were involved in a civil conspiracy to injure him.

The district court, in a memorandum and order dated April 16, 1991, granted summary judgment for the defendants on all claims. Addressing Frazier's § 1983 claims, the court ruled that Stevens, CAFS, Flinker, and MSPCC were absolutely immune from suit for all claims involving testimonial participation and were entitled to qualified immunity for all their other functions. As for Dr. Gelinas, the court concluded that she was not a state actor nor did she conspire with state actors and, therefore, was not amenable to suit under § 1983.

On the Massachusetts state law claims, the district court declined to follow the magistrate's finding that federal immunity applied. Instead, the court reviewed the relevant state law immunity principles. The court determined that these principles were akin to those governing federal judicial immunity. According to the court, under Massachusetts law, "once a court finds that nonjudicial persons 'fulfill quasi-judicial functions intimately related to the judicial process[,] [they] have absolute immunity for damage claims arising from their performance of the delegated functions.'" (Citations omitted). Under section 51B the court further found absolute immunity for anyone required to provide information under the statute. Such information would include investigations and reports required by the statute or information given a district attorney.

Applying these principles to the state law claims against Stevens, CAFS, Flinker, and MSPCC, the court found these defendants absolutely immune from suit under section 51B. The court also added that Stevens and Flinker were, in all likelihood, absolutely immune from suit because of their connection with the probate court. Finally, the court observed that under the MCRA, public officials enjoy qualified immunity and thus, the defendants had an additional source of immunity as to the state civil rights claim.

The court found Dr. Gelinas immune from suit on a different ground. Under Massachusetts law, the court held that all statements made in the institution or conduct of litigation or in conferences or in communications preliminary to litigation are absolutely privileged. The court ruled that Frazier's claims arose from statements that Dr. Gelinas made in connection with litigation which were, therefore, absolutely privileged.

Finally, as to Dr. Bailey, in addition to finding his communications absolutely privileged as connected with litigation, the court ruled that he also had statutory immunity as a member of the section 51D multi-disciplinary team.

To summarize, the court dismissed all claims against the defendants on various immunity grounds except the § 1983 claim against Dr. Gelinas. The court dismissed that claim by finding that Dr. Gelinas was not a state actor and, therefore, not amenable to suit.

## Discussion

### I. SECTION 1983 CLAIM

Frazier first appeals the district court's grant of summary judgment on absolute and qualified immunities grounds on the § 1983 claim in favor of Stevens, CAFS, Flinker, and MSPCC.[8] He argues that the

---

constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages.

8. Plaintiff does not appeal the grant of summary judgment on the § 1983 claim in favor of Gelinas. He concedes that "Gelinas was not acting under color of state law and therefore summary judgment on plaintiffs [sic] § 1983 claim was properly allowed."

district court erroneously held that the defendants were entitled to at least qualified immunity merely because of the nature of their profession. Frazier contends that there remain issues of material fact as to whether the defendants were entitled to summary judgment as a matter of law.

■ We first address the issue of whether Stevens and Flinker are entitled to raise a qualified immunity defense. As a preliminary matter, we find that Stevens and Flinker acted under "color of law" and therefore are amenable to suit under § 1983. "It is the [worker's] function within the state system, not the precise terms of h[er] employment, that determines whether h[er] actions can fairly be attributed to the state." *West v. Atkins*, 487 U.S. 42, 55–56, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40 (1988). In this case, DSS contracted with CAFS and MSPCC to provide services required by statute. Stevens and Flinker, as employees of the respective agencies, performed functions that are inherently governmental in nature. Therefore, they acted under "color of law" for the purpose of § 1983.

■ The Supreme Court, in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), left undecided the question of whether private parties found to be state actors under § 1983 are entitled to qualified immunity. *Id.* at 942 n. 23, 102 S.Ct. at 2756 n. 23.[9] It is an issue of first impression in this circuit whether private parties under contract to perform statutorily mandated governmental duties are entitled to qualified immunity as functionally governmental employees. *See Lovell v. One Bancorp*, 878 F.2d 10, 12 n. 4 (1st Cir.1989).

In other cases concerning the question of whether private defendants are entitled to qualified immunity, this circuit's analysis has depended on the relationship of the private party to the government. In the recent case of *Mello Rodriques v. Furtado*, 950 F.2d 805, 814 (1st Cir.1991), we ruled that a physician under court order to perform a vaginal cavity search was entitled to raise a qualified immunity defense. We focused on the public policies involved in granting qualified immunity. We found an entitlement of qualified immunity proper when the defendant's action was compelled by the state government. *Id.* We found that the physician was " 'invested with [and ha[d] accepted] the responsibilities of a public official in the public interest.' " *Id.*, at 815 (quoting *Duncan v. Peck*, 844 F.2d 1261, 1264 (6th Cir.1988)). Because the government and not the private actor initiated the challenged search, we held that the physician was entitled to raise a qualified immunity defense.

In comparison, in *Felix de Santana v. Eligio Velez*, 956 F.2d 16, 19–20 (1st Cir. 1992), we refused to extend qualified immunity to a private individual who conspired with a district attorney to indict a co-worker for perjury. The private individual in *Felix de Santana* had allegedly taken over a criminal prosecution in order to remove his co-worker from the cooperative at which both had been officers. We reasoned in that case that private individuals who voluntarily utilized the state for their own selfish purposes were not entitled to qualified immunity. *Id.*

■ In this case, Stevens and Flinker, through their respective agencies, were under contract to perform the duties statutorily required of the state. They, like the physician in *Mello Rodriques*, were compelled by the government to undertake the investigation of Frazier. *See DeVargas v. Mason & Hanger–Silas Mason Co.*, 844 F.2d 714, 721–22 (10th Cir.1988) (court reasoned that private individuals under contract with government were compelled to act and therefore, were entitled to qualified immunity). Further, Stevens and Flinker were performing duties that would otherwise have to be performed by a public official who would clearly have qualified immunity.

**9.** "We need not reach the question of the availability of [qualified immunity] to private individuals at this juncture."

We hold, therefore, that individuals like Stevens and Flinker, under contract with the government, are entitled to raise a qualified immunity defense because they are the functional equivalent of public officials.

██ We next consider whether Stevens and Flinker are entitled to qualified immunity as a matter of law.[10] Public officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Burns v. Loranger*, 907 F.2d 233, 235 (1st Cir.1990); *Morales v. Ramirez*, 906 F.2d 784, 787 (1st Cir.1990). *Harlow* requires that we examine two issues: (1) whether at the time of the alleged conduct there was a clearly established constitutional right that was violated; and (2) whether a reasonable person would have known that her conduct violated that constitutional right. *See Burns*, 907 F.2d at 235–36.

The Supreme Court has held that to find a "clearly established" constitutional right "[t]he contours of the right must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. The constitutional right must be established at the time of the alleged violation; a court may not find that the right was established through the use of hindsight. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st Cir.1989); *see also Stem v. Ahearn*, 908 F.2d 1, 5 (5th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). Further, a plaintiff must allege more than conduct that violates an "abstract" constitutional principle; he must plead with particularity a concrete constitutional right. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

In this case, Frazier alleges that Stevens and Flinker violated his constitutional "liberty interest in the care, custody and management of his children." Specifically, he claims that Stevens and Flinker impermissibly interfered in his relationship with his children by programming Teresa and Dylan to falsely accuse him of sexual abuse. Frazier further asserts that the reports and/or testimony that Stevens and Flinker supplied the probate court and the District Attorney's Office caused long periods of interruption in his relationship with his children. Though it is unclear from the face of the complaint, Frazier appears to allege that his substantive due process rights were violated.

In order to determine whether Flinker and Stevens are entitled to qualified immunity as a matter of law, we must ascertain whether Frazier alleged a particularized constitutional right established at the time of the alleged improper conduct. The Supreme Court in several cases has recognized an abstract fundamental liberty interest in "familial integrity." *See Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unwed father has fundamental right in the care and custody of children born out of wedlock with whom he maintained strong parental relationship); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (parents have fundamental interest in the religious upbringing of children); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (parents have fundamental interest in the education of their children).

The Court, however, has never recognized the right to familial integrity as absolute or unqualified.[11] *See, e.g., Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983) (relationship between parent and child merits con-

---

**10.** In *Downs v. Sawtelle*, 574 F.2d 1 (1st Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978), a case decided prior to *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the court remanded to the district court the issue of whether a social worker has qualified immunity. We now hold, as a matter of law, that social workers in positions such as those involved here are entitled to qualified immunity. *See e.g., Hodorowski v. Ray*, 844 F.2d 1210, 1216–17 (5th Cir. 1988).

**11.** We note that plaintiff in his brief concedes that "while it is acknowledged that in [the con-

stitutional protection in "appropriate cases"); *Prince*, 321 U.S. at 166, 64 S.Ct. at 442 ("But the family itself is not beyond regulation in the public interest...."). Within a family itself resides the sometimes competing interests of a parent's right to rear his or her child and the fundamental rights of that child. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 244–45, 92 S.Ct. 1526, 1547–48, 32 L.Ed.2d 15 (1972) (Douglas, J., dissenting in part) (children may have differing view from that of parent on their appropriate education); *Woodrum v. Woodward County*, 866 F.2d 1121, 1125 (9th Cir.1989) (though liberty interest exists in the maintenance of the family, this interest must be weighed against interest of child). Furthermore, the government itself has a compelling interest in the health, education, and welfare of children as future citizens. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982) (state has *parens patriae* interest in welfare of child); *Wisconsin v. Yoder*, 406 U.S. at 213, 92 S.Ct. at 1532 ("There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education.").

Although the Court has required in appropriate cases procedural safeguards prior to the termination of the relationship between parent and child, it is beyond doubt that the relationship can be terminated if the parent is unfit. *See Santosky*, 455 U.S. at 769, 102 S.Ct. at 1403 (to terminate parental rights state must prove by "clear and convincing evidence" that parent is unfit); *Stanley*, 405 U.S. at 658, 92 S.Ct. at 1216 (state must provide unwed father with hearing *prior* to terminating his parental rights). The Court has refused to find that a biological relationship between parent and child is, by itself, a fundamental relationship worthy of any constitutional protection. *See, e.g., Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (upholding California statute excluding biological father from claiming parental rights of child

born to mother while married to other man because statute did not violate historic concept of "unitary family"); *Lehr*, 463 U.S. at 267–68, 103 S.Ct. at 2996–97 (upholding New York statute that did not require notice prior to adoption to biological father who had not taken affirmative steps to develop relationship with child).

Lower courts have observed the difficulties of finding a "clearly established" constitutional right in the context of family relationships. *See Landstrom v. Illinois Dep't of Children & Family Serv.*, 892 F.2d 670, 675–78 (7th Cir.1990); *Baker v. Racansky*, 887 F.2d 183, 186–89 (9th Cir. 1989); *Hodorowski*, 844 F.2d at 1216–17; *Myers v. Morris*, 810 F.2d 1437, 1462–63 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). These cases focus on two concerns: [1] the difficulty of alleging a right with sufficient particularity; and [2] the qualified nature of all rights in this area.

█ It is not sufficient for a plaintiff to allege an abstract due process liberty interest in family relationships. The qualified immunity defense requires that the constitutional right be stated with particularity. As the Supreme Court observed in *Anderson:*

> [t]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. *But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow.*

483 U.S. at 639, 107 S.Ct. at 3039 (emphasis added). *Harlow* requires a constitutional right to be clearly established so that public officials are on notice that their conduct is in violation of that right. Lower courts

---

text of counseling and evaluating Teresa] the state also has a legitimate interest in the child's welfare the court *should balance* that interest

against plaintiff's...." (Plaintiff's brief at 13) (emphasis added).

that have applied this doctrine in cases involving alleged child abuse have concluded that it cannot be "objectively reasonable" to expect public officials to know that their conduct violated a generalized right to "familial integrity." *See Landstrom,* 892 F.2d at 677; *Hodorowski,* 844 F.2d at 1216–17. Such cases require a more fact-specific inquiry into whether the defendants' actions violated a particularized, "clearly established" constitutional right. *See Landstrom,* 892 F.2d at 678; *Hodorowski,* 844 F.2d at 1217.

The courts have also emphasized the amorphous nature of a liberty interest in familial relationships. Because this interest must always be balanced against the governmental interest involved, it is difficult, if not impossible, for officials to know when they have violated "clearly established" law. *Baker,* 887 F.2d at 187; *Myers,* 810 F.2d at 1462–63; *see also Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.) (discussed difficulty of finding "clearly established" right in first amendment area subject to balancing of interests), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). As the court in *Myers* observed, "if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent." 810 F.2d at 1462 (citation omitted). The right of familial integrity is such a right.

We agree with other courts that while there may be a due process right of "familial integrity" of some dimensions, the dimensions of this right have yet to be clearly established. Moreover, to the extent it is well-defined, the liberty interest is not absolute but rather balanced against the governmental interest. In such circumstances we find that Frazier has failed to show that the steps taken by Stevens and Flinker in responding to the allegations of sexual abuse "violated the nebulous right of family integrity." *Hodorowski,* 844 F.2d at 1217. Because the right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful, Stevens and Flinker are entitled to qualified immunity as a matter of law.[12]

We also affirm the grant of summary judgment in favor of CAFS and MSPCC. Though plaintiff never adequately alleges a cause of action against CAFS and MSPCC, it can be assumed that the only possible liability of the two agencies would derive from the culpability of their respective employees. Because we find

**12.** Because we find Stevens and Flinker entitled to qualified immunity we need not address here whether, as private social workers under contract with the government, they are entitled to raise an absolute immunity defense. We do observe, however, that Stevens and Flinker, as private actors, are entitled, under common law, to absolute immunity for all testimony given to a court or a grand jury. *See Briscoe v. LaHue,* 460 U.S. 325, 334, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983).

We also observe that it is well established that *public* officers possess absolute immunity for activities that are intimately associated with the judicial process. *See Burns v. Reed,* — U.S. —, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (prosecutors have absolute immunity when conducting probable cause hearing); *Briscoe,* 460 U.S. at 345–46, 103 S.Ct. at 1120–21 (public officials retain absolute immunity when testifying in court); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (administrative officers retain absolute immunity when acting as hearing examiner or in role analogous to prosecutor). Absolute immunity depends not on the titles of officials but their functions. *See*

*Burns,* — U.S. at —, 111 S.Ct. at 1939; *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913.

Further, lower courts have provided social workers and other public officials with absolute immunity for actions involving the initiation and prosecution of child custody or dependency proceedings. *See Millspaugh v. County Dep't of Public Welfare,* 937 F.2d 1172, 1176 (7th Cir.) (social worker immune from suit for failure to furnish information to the court and pursuing litigation after parents were clearly entitled to custody), *cert. denied,* — U.S. —, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *Stem v. Ahearn,* 908 F.2d at 6 (social worker possesses absolute immunity when testifying at a child-custody hearing); *Meyers v. Contra Costa County Dep't of Social Serv.,* 812 F.2d 1154, 1156–57 (9th Cir.) (social workers immune as quasi-prosecutorial officers when initiating child dependency proceedings), *cert. denied,* 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); *Malachowski v. City of Keene,* 787 F.2d 704, 712–13 (1st Cir.) (juvenile officer is immune from damages when initiating juvenile delinquency proceeding), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Kurzawa v. Mueller,* 732 F.2d 1456, 1458

that Stevens and Flinker were entitled to a defense of qualified immunity as a matter of law, we find no basis for recovery against the agencies.[13]

## II. STATE LAW CLAIMS

▮▮▮▮ Frazier appeals the grant of summary judgment in favor of Dr. Bailey and Dr. Gelinas on the state law claims of negligence, gross negligence, and defamation. He also appeals the grant of summary judgment in favor of Dr. Bailey on the Massachusetts Civil Rights claim.[14] He argues that the district court improperly held that Dr. Bailey and Dr. Gelinas were entitled to absolute immunity as a matter of state law.

### A. Dr. Gelinas

▮▮▮▮ Though it is unclear from his brief, Frazier apparently alleges that Dr. Gelinas acted improperly in counselling his children, in communicating to the DSS and various law enforcement officials, and in testifying before a grand jury. Frazier alleges various torts including: negligence, gross negligence, defamation, and intentional infliction of emotional distress. He also alleges a violation of the MCRA.[15]

▮▮▮▮ Under state law, communications made in the " 'institution or conduct of litigation or in conferences and other communications preliminary to litigation' " are subject to absolute privilege. *Sullivan v.* *Birmingham,* 11 Mass.App. 359, 416 N.E.2d 528, 530 (1981) (citation omitted) (summarizing Massachusetts case law to that effect); *see also Dolan v. Von Zweck,* 19 Mass.App. 1032, 477 N.E.2d 200, 201 (1985). Such communications cannot be unnecessarily or unreasonably published. If so, the communication is no longer privileged. *See Dolan,* 477 N.E.2d at 201; *Sullivan,* 416 N.E.2d at 530.

Frazier's allegations against Dr. Gelinas all arise from communications made during litigation.[16] Though Frazier attempts to distinguish cases like *Dolan* which focus solely on defamation, this is a distinction without a difference. Any possible allegation of negligence, gross negligence, intentional infliction of emotional distress, or violation of the MCRA arise from evaluations and communications given to third parties, be they the DSS or a grand jury, as part of a divorce proceeding and pursuant to a criminal investigation. If Dr. Gelinas had not made statements about Frazier's alleged sexual abuse, Frazier would not have been harmed. Because we find that Frazier's allegations stem only from communications made in the course of litigation, we hold that Dr. Gelinas enjoys absolute immunity from the state law claims.

### B. Dr. Bailey

▮▮▮▮ Though it is again unclear from the brief, Frazier apparently alleges that

---

(6th Cir.1984) (guardian ad litem retains absolute immunity to enable him to act in the best interest of the child; psychiatrists providing information to court entitled to absolute immunity as functionally analogous to witnesses).

**13.** We express no opinion as to whether a private agency under contract to the state may be liable under a theory of respondeat superior for the actions of its employee.

**14.** The state law claims against Stevens, Flinker, CAFS, and MSPCC have been waived by the plaintiff. In his brief plaintiff only addresses the grant of summary judgment on federal immunity grounds in regards to the social workers and their respective agencies. Plaintiff only discusses the grant of summary judgment on state law immunity grounds in regards to Bailey and Gelinas. In the absence of proper presentation of the issues, the state law claims are deemed waived. *See, e.g., Willhauck v. Halpin,* 953 F.2d 689, 700 (1st Cir.1991) (review of First Circuit

cases requiring full presentation of arguments on appeal).

Admittedly, in plaintiff's reply brief state law immunity issues are raised in regards to Stevens. We have held, however, that arguments raised in a reply brief are insufficient to preserve a claim on appeal. *See Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983).

**15.** In plaintiff's complaint he also alleged that Gelinas, along with Flinker, CAFS, Stevens, and MSPCC, were involved in a civil conspiracy. Plaintiff, however, failed to even mention this claim on appeal. We, therefore, deem it waived. *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

**16.** Plaintiff also alleges that Dr. Gelinas improperly treated his children. This claim, however, is not properly before us because it does not involve plaintiff's harm but that of his children, who are not parties to this action.

Dr. Bailey acted improperly when submitting an unsubstantiated evaluation to Assistant District Attorney Fennell. We find that, under *Dolan,* Dr. Bailey was entitled to absolute immunity because this communication was made to a district attorney after Frazier had been arrested on criminal charges.

## III. CONCLUSION

We find that Stevens and Flinker were entitled to qualified immunity on the § 1983 claim. We also find that Dr. Gelinas and Dr. Bailey were entitled to absolute immunity on the state law claims. Finally, we uphold the grant of summary judgment in favor of CAFS and MSPCC on the § 1983 claim.

*Affirmed.*