No. 95-1908

Kelly Thomason;          *
Randy Thomason,                            *
                                           *
            Appellants,      *
                                           *
      v.                     *
                                           *
SCAN Volunteer Services, Inc.;   * Appeal from the United States
Lynn Sims, individually and in   * District Court for the
her official capacity as County  * Eastern District of Arkansas
Director of SCAN Volunteer       *
Services, Inc.; Geneva Wordlaw,  *
individually and in her official*
capacity as a Case Worker for    *
SCAN Volunteer Service, Inc.;    *
Dr. Russell Steele,              *
                                 *
            Appellees.       *

Submitted:  November 16, 1995

Filed:  June 11, 1996

Before McMILLIAN, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

McMILLIAN, Circuit Judge.

     Kelly Thomason (Thomason), and her husband, Randy Thomason (together plaintiffs), appeal from a final judgment entered in the United States District Court[1] for the Eastern District of Arkansas dismissing their due process claim against defendants SCAN Volunteer Services, Inc. (SCAN), Lynn Sims, and Geneva Wordlaw (collectively defendants) pursuant to 42 U.S.C. § 1983.  Thomason

---

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

v. SCAN Volunteer Servs., No. LR-C-93-893 (E.D. Ark. Mar. 8, 1995) (judgment).  For reversal, plaintiffs argue that the district court erred in holding that defendants did not violate plaintiffs' constitutional rights as a matter of law, and, even if defendants did violate plaintiffs' rights, defendants are protected by qualified immunity.  Id., slip op. at 7 (Feb. 13, 1995) (memorandum and order granting summary judgment).  For the reasons discussed below, we affirm.

## Background

It is undisputed that SCAN, a not-for-profit corporation located and operating in Pulaski County, Arkansas, had at all relevant times the power under Arkansas state law to investigate allegations of suspected child abuse, to refer such abuse to the state prosecuting authorities, to remove victims of suspected parental abuse from their homes, and to seek protective custody for such victims by order of the Juvenile Court of Pulaski County, Arkansas.  Joint Appendix at 3 (Complaint ¶ 6).  SCAN operates under the direction of the Arkansas Department of Human Services, Division of Children and Family Services (DHS/DCF).  Lynn Sims and Geneva Wordlaw were at all relevant times employees of SCAN.

At approximately 1:44 p.m. on December 19, 1990, Andrea Goin, the director of services at SCAN, received a telephone call from Shaun Wilfong at DHS/DCF.  Wilfong informed Goin that she (Wilfong) had received by facsimile transmission some documents from a Little Rock physician, Dr. William R. Collie, and that she was, in turn, sending those documents to Goin, also by facsimile transmission.  These documents concerned plaintiffs' eight-month-old infant, Anthony Thomason (Anthony).  According to Goin's deposition testimony, Wilfong did not indicate that she had received any information regarding Anthony other than the documentation which she had received from Dr. Collie and was passing along to Goin.  Id. at 151.  Goin received the facsimile transmission from Wilfong

shortly after their telephone conversation ended. The transmitted documents included, in their entirety, three items: a letter from Dr. Thomas G. DiSessa to Dr. Collie dated October 25, 1990; a letter from a Dr. DiSessa to Dr. Collie dated December 14, 1990; and an article from the Journal of Pediatrics, which Dr. DiSessa had attached to his December 14 letter to Dr. Collie. Joint Appendix at 205-15. The medical journal article discussed a rare psychological disorder called "Munchausen by Proxy" believed to be displayed by parents (typically mothers) who subject their young children to potentially life-threatening and diagnostically elusive forms of physical abuse in order to draw sympathy and attention to themselves.

In his letter dated December 14, 1990, Dr. DiSessa indicated that he had been treating Anthony since October 25, 1990, when Anthony was brought to Dr. DiSessa's outpatient clinic for a second opinion following treatment at Little Rock Children's Hospital for tachycardia (rapid heart rate). He further stated that Thomason, Anthony's mother, "has intermittently reported that the child has had apnea." In late October 1990, the letter continued, he (Dr. DiSessa) received a phone call from Thomason in which she reported that Anthony had undergone recurrent episodes of paleness, grayness, and sweatiness, and she requested that Anthony be admitted to the hospital for observation. Anthony was admitted to LeBonheur Hospital for a period from November 5, 1990, to November 9, 1990. Referring to that hospital stay, Dr. DiSessa's letter stated "during the 5 day admission, there [were] no episodes of paleness, grayness, duskiness, blueness or apnea noted by our nursing staff." Anthony was sent home with an "event recorder." Since that time, the letter continued, Thomason "has phoned in 8 separate events." According to the readings from the recorder, these reported events correlated with heart rates of "normal sinus rhythm with no evidence of a supraventricular tachycardia arrhythmia"; these "traces" had been sent for review to Dr. Paul Gillett, a "world renowned pediatric cardiac electrophysiologist."

The final two paragraphs of Dr. DiSessa's December 14 letter stated the following:

> On December 13th, mother again called my office with the following concerns. Her concerns were those of fast heart rate, paleness, grayness, clamminess and sweating. In addition, the mother reported that the baby had a severe apnea episode producing blueness approximately a week to 10 days ago. After the baby required a substantial amount of stimulation, mother failed to seek medical attention for this apnea episode.

> This failure to seek medical attention for the apnea episode is a great concern to me. The mother's general affect has also been of great concern to a number of physicians here at LeBonheur Hospital. Mother has been described by at least two physicians as being dysfunctional. . . . My greatest fear is that this child may fall into the category of children recently reported in the Journal of Pediatrics . . . [which] reported 27 infants who suffered "recurrent apnea and sudden infant death" who were in reality suffered repetitively [sic] suffocation events by their mother. These events began between ages in 1 and 3 months of age and went on until the child died between 6 and 12 months later. I believe that this possibility needs to be explored. Unfortunately, my distance precludes that I explore it effectively. If your familiarity with this family substantiates this suspicion, I would like to recommend that you refer this case to Arkansas Social Services for further exploration.

Id. at 205-06.

According to Goin's deposition testimony, during her telephone conversation with Wilfong, she began filling out a form with the preprinted title "Division of Children and Family Services Child Abuse and Neglect Reporting," which she completed sometime after receiving the facsimile transmission from Wilfong. At the bottom of page 1 of this form, she wrote: "Dr. DiSessa (Pediatrics at U of Tennessee and LeBonheur Children's Medical Center) reports that the mother is intermittently smothering the baby." Id. at 147-50; 201.

The decision was made by SCAN personnel, including Goin, that Anthony should be removed from the home and taken to a hospital for a medical evaluation. This task was assigned to Wordlaw. According to Wordlaw, she was told by Goin to go to plaintiffs' home "immediately." Id. at 70. At that time, all the information that Wordlaw had received about Anthony's case was Goin's verbal indication that SCAN had received a report, including some medical information, that the mother had smothered the baby. Id. at 69-71. Having no other information and having not reviewed any of the documentation, Wordlaw went to plaintiffs' home at approximately 4:30 p.m. When Wordlaw arrived at plaintiffs' residence, Thomason was home with her three children. Wordlaw identified herself as an evaluator with the Pulaski County SCAN office and informed Thomason that SCAN had received a report that "her child was being smothered and that she was the alleged perpetrator." Id. at 72. Thomason became very upset, denied the accusation, and telephoned her mother-in-law, who promptly came to the house. Id. at 72-73. Having told Thomason that the decision had been made by SCAN to take the baby to the hospital, Wordlaw removed Anthony from the home and took him to Arkansas Children's Hospital.[2]

_____

[2]Defendants argue that Thomason in fact voluntarily consented to the removal of Anthony from plaintiffs' home. They refer to Wordlaw's deposition statement that Thomason was "in agreement" after Wordlaw "told [Thomason] that [she, Wordlaw,] needed to take the child to the hospital." Defendants also rely on the fact that Thomason provided Wordlaw with a car seat when Wordlaw did not have one. Brief for Appellees at xii (citing Joint Appendix at 74, 77 (deposition of Geneva Wordlaw)). We hold that defendants have not established beyond genuine dispute that Thomason voluntarily consented to the removal of Anthony from plaintiffs' home. If anything, the evidence indicates that Wordlaw never gave Thomason a choice in the matter. See Joint Appendix at 75, 77 (Deposition of Geneva Wordlaw: "Q. You didn't both decide in conjunction with one another; you decided to take the child to the hospital, is that right? A. Yes, I did. Well, SCAN did."; "Q. And when you got to the Thomason home you knew at that moment when you knocked on the door you were going to take the child to the hospital, is that right? A. Yes.") Having been told that her eight-month-old child was being taken to the hospital, Thomason's insistence that he ride in a car seat does not suggest that she voluntarily consented to Wordlaw's removal of him from the home.

Two days later, on December 21, 1990, SCAN submitted an ex parte application to the Pulaski County Chancery Court, along with a supporting affidavit signed by Wordlaw, recommending that Anthony be placed in the custody of the State of Arkansas Division of Children and Family Services. Wordlaw's affidavit was written by herself, Andrea Goin, and one or two other individuals. Id. at 83 (deposition of Geneva Wordlaw); id. at 176 (deposition of Andrea Goin). At the time she signed the affidavit, Wordlaw had not reviewed any medical records concerning Anthony other than the two letters written by Dr. DiSessa. Id. at 85. Wordlaw's affidavit included the statement "[m]edical records and physicians concur that Anthony Thomason showed evidence of `intermittent smothering.'" Id. at 104. On the same day that the application and affidavit were received by the state court, the court entered an ex parte order removing Anthony from the custody of his parents and placing him in protective custody with the state. Anthony remained in the state's custody through the Christmas and New Year holidays until a hearing was held on January 2, 1991. During that time, he stayed at Arkansas Children's Hospital. Following the January 2, 1991, hearing, in which plaintiffs had the opportunity to present their side of the case, the state court quashed the ex parte order and returned Anthony to his parents subject to certain conditions, including that Anthony was to remain hospitalized for seven more days at plaintiffs' cost and that Thomason was to undergo some counseling. At a final hearing held on January 29, 1991, the state court dismissed SCAN's petition on grounds of insufficient evidence of abuse.

Plaintiffs brought this § 1983 action for compensatory and punitive damages, alleging that the removal of Anthony from their home, and their two-week separation from Anthony as a result of the state court's ex parte order, deprived them of their liberty interest in the care, custody, and management of their child, in

-6-

violation of their substantive due process rights.  Plaintiffs sued SCAN, as well as Wordlaw and Lynn Sims (the county director of SCAN), in their individual and official capacities.[3]  Plaintiffs also asserted a supplemental state law tort claim.  SCAN, Wordlaw, and Sims moved for summary judgment arguing that their conduct did not constitute state action for purposes of 42 U.S.C. § 1983 and, even if it did, defendants were immune from suit.  The district court granted their motion, stating "[a]ssuming without deciding that the defendants' actions were state action, the plaintiffs' Section 1983 action still fails because there was no deprivation of a constitutionally protected right.  Even if there were a constitutional deprivation, the defendants would be protected by qualified immunity and possibly by the Eleventh Amendment."  Slip op. at 7.  Thereafter, the district court entered judgment for defendants.  Thomason v. SCAN Volunteer Servs., (Mar. 8, 1995) (judgment).  Plaintiffs appealed.

## Discussion

We review a grant of summary judgment de novo.  The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992).  In the present case, the district court held that plaintiffs were not deprived of their

---

[3]Plaintiffs' additional claims against three doctors were dismissed without prejudice.  Thomason v. SCAN Volunteer Servs., No. LR-C-93-893 (E.D. Ark. Mar. 7, 1995) (order); id. (Aug. 22, 1994) (order).  Plaintiffs do not appeal the district court's dismissal of the doctors.

constitutional rights as a matter of law and, therefore, no liability could attach to SCAN or its employees, either in their individual or in their official capacities.

To begin, as to defendant Lynn Sims, who was sued in her individual capacity and in her official capacity as county director of SCAN, plaintiffs have not identified any specific or concrete facts supporting their claim that she caused a deprivation of their constitutional rights. In fact, her name is not mentioned anywhere in plaintiffs' statement of facts on appeal. Nor are we able to infer such facts from the evidence in the record. Because there is no evidence suggesting either that defendant Sims was personally or directly involved in the alleged violation of plaintiffs' constitutional rights, or that, in her capacity as a supervisor, she knew about the allegedly unlawful conduct and facilitated, approved, condoned, or deliberately ignored the conduct, we hold that the district court did not err in granting summary judgment on plaintiffs' claims against her both in her individual and in her official capacities. Cf. Ripson v. Alles, 21 F.3d 805, 808-09 (8th Cir. 1994) (where individual was arrested by a police officer without probable cause, the police chief was entitled to summary judgment dismissing the arrestee's § 1983 claims against him because his only connection to the unlawful conduct was that he was the supervisor of the arresting officer).

Turning to the claims against SCAN and Wordlaw, we are guided by our recent decision in Manzano v. South Dakota Dep't of Social Servs., 60 F.3d 505 (8th Cir. 1995) (Manzano), in which we described the constitutional right of parents in the care and control of their children as follows:

> Our court has recognized the liberty interest which parents have in the care, custody, and management of their children. Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.) (Myers) (citing Lehr v. Robertson, 463 U.S. 248, 258 (1983)), cert. denied, 484 U.S. 828 (1987); see

-8-

Lux by Lux v. Hansen, 886 F.2d 1064, 1066-67 (8th Cir. 1989) (Lux); Fitzgerald v. Williamson, 787 F.2d 403, 407 (8th Cir. 1983). However, we have at the same time indicated that this right is not absolute. Myers, 810 F.2d at 1462; see Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994) (Martinez) ("The right to familial integrity, however, has never been deemed absolute or unqualified."); accord Hodge v. Jones, 31 F.3d 157, 163 (4th Cir.) (Hodge), cert. denied, 115 S. Ct. 581 (1994); Doe v. Louisiana, 2 F.3d 1412, 1417 (5th Cir. 1993) (Doe), cert. denied, 114 S. Ct. 1189 (1994); Frazier v. Bailey, 957 F.2d 920, 929 (1st Cir. 1993) (Frazier). As we stated in Myers, "the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." 810 F.2d at 1462. Moreover, as the First Circuit has correctly noted, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993) (Watterson).

The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome. Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable. See Martinez, 35 F.3d at 1490; Hodge, 31 F.3d at 164; Frazier, 957 F.2d at 930; Myers, 810 F.2d at 1462-63. . . . Our court has not gone so far as to say that there are no "clearly established" substantive due process rights held by parents in the context of child abuse investigations. However, in Myers, we did recognize the problem of defining such rights. 810 F.2d at 1462-63. More generally, this need to balance competing interests makes the Siegert approach difficult to apply in child abuse cases involving the right to familial integrity.[ ] In these types of cases, it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis. See Martinez, 35 F.3d at 1490; Doe, 2 F.3d at 1417; Frazier, 957 F.2d at 929-31.

. . . .

Clearly, our precedents provide that, when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt

familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.

Manzano, 60 F.3d at 509-11 (footnote omitted).

In the present case, it is beyond genuine dispute that Dr. DiSessa, in his letter dated December 14, 1990, expressed his own suspicion that Thomason was engaging in a life-threatening form of child abuse. This suspicion, although based solely upon circumstantial evidence, was rationally drawn from Anthony's medical history, specific acts by Thomason which Dr. DiSessa described, and other physicians' alleged concern regarding Thomason's "affect." Defendants reasonably could have assumed that Dr. DiSessa was highly knowledgeable and experienced in these matters and lacked any motive to lie. Moreover, from defendants' perspective, the medical journal article may have lent additional credibility to Dr. DiSessa's theory of abuse. Therefore, we have little difficulty in holding that defendants, upon receiving the facsimile transmission of Dr. DiSessa's letters and the accompanying medical journal article, formed a reasonable suspicion of abuse which would justify some degree of interference with plaintiffs' rights as the parents of Anthony.

The difficulty in the present case is not whether such a reasonable suspicion can be found, but rather, whether the actions taken by defendants and the resulting disruption to plaintiffs' familial relations with Anthony were so disproportionate under the circumstances as to rise to the level of a constitutional deprivation. Viewing the evidence in the light most favorable to plaintiffs, the evidence demonstrates that, upon receiving Shaun Wilfong's phone call, the copies of Dr. DiSessa's letters, and the medical journal article, Wordlaw (at Andrea Goin's directions) proceeded to plaintiffs' residence with the intent to remove Anthony from plaintiffs' home without so much as a telephone call

either to Dr. DiSessa or to Dr. Collie to verify the source of the documents.[4] Moreover, without even reviewing the purported evidence of abuse in SCAN's possession, Wordlaw appeared at plaintiffs' doorstep and inaccurately asserted to Thomason that SCAN had "received a report [that] her child was being smothered and that she was the alleged perpetrator," Joint Appendix at 72 (deposition of Geneva Wordlaw). Finally, in seeking and obtaining an ex parte protective custody order from the state court, Wordlaw submitted a signed affidavit that arguably mischaracterized Dr. DiSessa's letters and exaggerated the strength of defendants' evidence of abuse.[5]

---

[4]We also note that Dr. DiSessa's letter of December 14, 1990, stated that he had sent the evaluation "traces" from Anthony's event recorder to Dr. Paul Gillett, a "world renowned pediatric cardiac electrophysiologist." Joint Appendix at 206. SCAN personnel also could have attempted to contact Dr. DiSessa to ascertain whether Dr. Gillett had rendered an opinion.

[5]As noted above, the affidavit stated "[m]edical records and physicians concur that Anthony Thomason showed evidence of 'intermittent smothering.'" Joint Appendix at 104. In the present appeal, defendants continue to maintain the accuracy of this statement, arguing:

> [B]y the time the affidavit was prepared on December 21, SCAN had the benefit of medical opinion of the Children At Risk team at the Arkansas Children's Hospital. The doctors on the team agreed that there was a reasonable basis to believe that Anthony was being intermittently smothered and that the mother, Mrs. Thomason, was suffering from a psychological condition known as Munchausen by Proxy. (JA 174-175) Thus, when the affidavit was prepared, physicians (plural) did concur.

Brief for Appellees at 11-12. The citation provided by defendants to support the above-quoted language refers to the following deposition testimony of *Andrea Goin* (not any of the doctors):

Q. Okay. Were there any doctors that agreed the mother was smothering the child?

A. If you're asking if they said in those words, "The mother is smothering the child" at that point,

Nevertheless, while we recognize that plaintiffs are justified in

no.

. . . .

Q.   To your knowledge had any doctor ever told you or wrote on any piece of paper that you know of or knew of at the time that the mother was smothering the child?

A.   What I remember from the meeting was the consensus in the meeting that the only way to know for sure, because there was not any medical reason that had been found for apnea, the only way to know for sure whether or not that was happening would be for the child to be in a neutral setting.

Q.   The doctors didn't know if it was happening or not, is that right?  Based on what you remember from that meeting?

A.   What I remember, I do not believe that anyone was willing to state beyond a shadow of a doubt at that point that that was happening.

Q.   Did any doctor at that meeting or any medical professional at that meeting offer an opinion that Kelly Thomason was suffering from Munchausen's by Proxy?

A.   As I said previously, that was discussed and that possibility was a part of that conversation.

Q.   Did any doctor or medical professional at that meeting say or offer any sort of medical opinion that Kelly Thomason was suffering from Munchausen's by Proxy?

A.   It was stated that that was a possibility.

Joint Appendix at 174-75.

Thus, even Goin did not state that the doctors found a "reasonable basis" to believe that Anthony was being intermittently smothered or that Kelly Thomason was afflicted with Munchausen by Proxy, much less that they "concurred" or "agreed" that such a reasonable basis existed.  All she said was that the doctors discussed these matters as possibilities.

-12-

feeling that more background investigation could have been done and that Wordlaw handled the initial encounter with Thomason in an unprofessional manner, we hold that plaintiffs' constitutional rights were not violated as a result of the removal of Anthony from

their home.  In <u>Manzano</u>, we observed that, in the child abuse context, the abstract substantive due process right to familial integrity must be continually subjected to "a balancing test which weighs the interest of the parent against the interests of the child."  60 F.3d at 510.  In the present case, the constitutional inquiry requires weighing the interest of plaintiffs not to have the state physically remove their eight-month-old child from their home against the state's interests in immediately removing the child from a potentially life-threatening abusive home setting for medical evaluation and protection.  We recognize that the parents' private interest in this type of acutely sensitive situation is "of the highest order."  <u>Doe v. Hennepin County</u>, 858 F.2d 1325, 1330 (8th Cir. 1988) (Henley, J., concurring), <u>cert. denied</u>, 490 U.S. 1108 (1989).  We also recognize the vital importance of curbing overzealous suspicion and intervention on the part of health care professionals and government officials, particularly where such overzealousness may have the effect of discouraging parents or caretakers from communicating with doctors or seeking appropriate medical attention for children with real or potentially life-threatening conditions.  The consequences of such a chilling effect could be devastating.  Our holding today is therefore limited to the facts of this case.  Where a treating physician has clearly expressed his or her reasonable suspicion that life-threatening abuse is occurring in the home, the interest of the child (as shared by the state as parens patriæ) in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a matter of law.  Because no constitutional violation occurred in the present case, defendants Wordlaw and SCAN cannot be held liable under § 1983 for the removal of Anthony from plaintiffs' home.[6]

---

[6]Wordlaw would also be protected by qualified immunity from personal liability for damages arising out of her actions in removing Anthony from plaintiffs' home.  In <u>Myers v. Morris</u>, 810 F.2d 1437, 1463 (8th Cir.), <u>cert. denied</u>, 484 U.S. 828 (1987), this court held that a prosecutor and sheriff's deputies were protected by qualified immunity for the removal of children from their homes upon receiving evidence of potential sexual abuse by their parents.  In so holding, this court observed that there was no legal precedent suggesting that "acting upon a reasonable belief that children are endangered by continued presence in their homes must be deferred until the completion of additional investigation."  <u>Id.</u>

Finally, Wordlaw and SCAN are absolutely immune from liability for their participation in the ex parte proceedings in state court that led to the award of temporary protective custody of Anthony to the state. To the extent Wordlaw and SCAN are sued for initiating the judicial proceedings, Wordlaw's role was functionally comparable to that of a prosecutor. See Myers v. Morris, 810 F.2d 1437, 1452 (8th Cir.) (Myers) (prosecutor is absolutely immune for initiating neglect proceedings in family court) (citing Mazor v. Shelton, 637 F. Supp. 330, 334-35 (N.D. Cal. 1986) (role of social worker in filing proceedings to protect abused minors is functionally comparable to prosecutor's initiation of the judicial process, thus warranting absolute immunity)), cert denied, 484 U.S. 828 (1987). To the extent Wordlaw and SCAN are sued because Wordlaw made arguably false statements in her affidavit in her role as a witness before the state court, the doctrine of absolute witness immunity applies. See Manzano, 60 F.3d at 512 (absolute immunity applied to state officials who testified in support of family court's temporary protective order restricting the plaintiff's unsupervised visitation with his daughter); Myers, 810 F.2d at 1466 (absolute immunity extends to witness's acts of providing reports and recommendations to family court); cf. Briscoe v. LaHue, 460 U.S. 325, 342-46 (1983) (absolute witness immunity rests on functional category and thus bars § 1983 claim alleging that police officer's perjured testimony resulted in a constitutional deprivation).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.