968 F.Supp. 1372 (1997)
Kenneth E. HAWLEY and Margaret Hawley, Plaintiffs,
v.
Donald NELSON, et al., Defendants.
No. 4:96 CV 441 DDN.
United States District Court, E.D. Missouri, Eastern Division.
April 4, 1997.
*1373 *1374 *1375 Kenneth E. Hawley, Rolla, MO, pro se.
Margaret R. Hawley, Rolla, MO, pro se.
Paul M. Rauschenbach, Associate, Denise L. Thomas, Atty. Gen. of Mo., Asst. Atty. Gen., St. Louis, MO, for Donald Nelson.
Paul M. Rauschenbach, Associate, St. Louis, MO, for Teresa Winemiller, Wayne Langston, Lynn Slawson.
Ian P. Cooper, Michael R. Annis, Peper and Martin, St. Louis, MO, for Kaye Harmes, Roger Berkbuegler, Kent King.
*1376 Michael Ray Dunbar, Smith and Hutcheson, Waynesville, MO, for Carl James.
Charlene Wheeler, Rolla, MO, pro se.
Andrew J. Lay, Atty. Gen. of Mo., Asst. Atty. Gen, St. Louis, MO, for John W. Wiggins, Mary W. Sheffield, Ralph Haslag, Douglas E. Long, Circuit Court of Phelps County.
Denise L. Thomas, Atty. Gen. of Mo., Asst. Atty. Gen., St. Louis, MO, for Russell Sheldon.
Anthony R. Behr, Behr and Mantovani, St. Louis, MO, for Russell Carnahan, Melvin E. Carnahan, Roger A. Carnahan, William E. Hickle.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court upon the motions of (1) defendant Charlene Wheeler to dismiss (Doc. No. 6); (2) defendants John W. Wiggins, Mary W. Sheffield, Ralph Haslag, and Douglas E. Long to dismiss (Doc. No. 42); (3) the defendant Circuit Court of Phelps County to dismiss (Doc. No. 43); (4) defendant Carl James to dismiss (Doc. No. 46); (5) defendants Teresa Winemiller, Caroline Bradford, Wayne Langston, and Lynn Slawson to dismiss (Doc. No. 47); (6) defendants Donald Nelson and Russell Sheldon to dismiss (Doc. No. 48); (7) defendants Russell Carnahan, Melvin E. Carnahan, Roger A. Carnahan, and William E. Hickle to dismiss (Doc. No. 51); (8) defendant Kaye Harmes to dismiss (Doc. No. 53); defendant Roger Berkbuegler to dismiss (Doc. No. 54); (9) defendant Kent King to dismiss (Doc. No. 55); (10) plaintiffs for sanctions (Doc. No. 66); and (11) plaintiffs for a trial setting track assignment (Doc. No. 75). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c)(3).
Plaintiffs commenced this action by filing a lengthy complaint seeking relief against the defendants under 42 U.S.C. § 1983, and under Missouri state law, relating to the removal of their two minor sons from their home. Defendants are employees of the Phelps County, Missouri, Division of Family Services; the Rolla, Missouri, Public High School; judges of the Circuit Court of Phelps County, Missouri; Phelps County juvenile court officials; and two private individuals. Plaintiffs seek declaratory relief, monetary damages, and injunctive relief.

Plaintiffs' complaint allegations.
In their 11 count, 66 page complaint, plaintiffs allege that on December 20, 1990, the Juvenile Court of Newton County, Missouri, terminated a previously issued order of protection and ordered the return to plaintiffs of their son, Joshua, then 16 years of age. Exhibit A, attached to plaintiffs' complaint,[1] indicates that plaintiffs' son had been placed in the protection of the boy's uncle and aunt and the Missouri Division of Family Services (MDFS).[2]
Plaintiffs allege that on December 30, 1990, Joshua's behavior became destructive and violent and, at 10:45 a.m., he walked away from their residence against their directions. While away from their home, Joshua contacted the Phelps County Division of Family Services (PCDFS).[3] In the afternoon of the same day, Teresa Winemiller, a PCDFS employee, brought the boy in her vehicle back to the plaintiffs' residence and interviewed Joshua and the plaintiffs. Plaintiffs allege that Winemiller told them that the boy would not be placed in another foster home; that, if the child abused his parents or if they abused him, a counseling case would *1377 be opened; and that, if Joshua could not manage to stay with his parents, he would be placed in the state hospital at Fulton, Missouri, for custodial care because there is no foster home capable of managing Joshua.
Plaintiffs further allege that at approximately 2:00 p.m. and again at approximately 4:00 p.m. on December 30, plaintiff Kenneth Hawley telephoned Winemiller at the PCDFS Office about Joshua acting out of control. Winemiller, after consulting with defendant Caroline Bradford, also employed by the PCDFS, advised Kenneth to manage the boy as well as he could. At approximately 4:30 p.m. Kenneth called the Rolla, Missouri, Police Department and consulted with Officer Allison about how to deal with Joshua's violent and threatening behavior. Allison said that the police would respond to the residence, if they receive a call for assistance.
Plaintiffs also allege that, at approximately 5:15 p.m. on December 30, Kenneth called the stress center at the Phelps County Regional Medical Center concerning how to manage Joshua's violent behavior. Kenneth also asked about the availability and use of restraints for his son. The stress center worker advised him to call the police as they can bring the boy to the stress center if needed. At approximately 7:00 p.m. that evening, Kenneth Hawley called the Rolla Police Department and reported that his son was acting violently, in a threatening manner, and out of control.
Plaintiffs allege that on January 3, 1991, they registered Joshua at the Rolla, Missouri, Public High School. Plaintiffs explained to the school counselor, defendant Kaye Harmes, their son's history of getting the authorities that are involved in his life to work against each other. Plaintiffs emphasized to Harmes the importance of and the necessity for the school and the parents to communicate and work together concerning the boy. Plaintiffs requested that Harmes contact them if she hears strange allegations about what is happening at their home.
Plaintiffs allege that on January 7, 1991, their other son, Caleb, then age 13, telephoned Emergency 911 while plaintiffs were attempting to control Joshua. Three Rolla police officers responded and were at the plaintiffs' residence from approximately 10:00 to 11:00 p.m.
Plaintiffs allege that on January 8, 1991, they kept Joshua home from school until he would allow his father to check his chore list. Joshua chose to stay home from school all day. Joshua also telephoned and complained to the PCDFS.
Plaintiffs allege that on January 18, 1991, Kenneth Hawley spoke with Rolla High School assistant principal Mike Fisher regarding Joshua's behavior at home, and Kenneth took Joshua back home to finish his chores before returning him again to the school. On January 23, plaintiffs spoke with Fisher and Harmes about their method of discipline and how Joshua must finish his assigned home duties before going to school. Plaintiffs also emphasized the importance that Fisher and Harmes tell them if they hear strange allegations of what is happening at Joshua's home. They explained that this was because Joshua gets the authorities involved in his life to work against each other.
Plaintiffs allege that on January 27, Joshua ran away from home and they reported this to the Rolla Police Department. On February 6, 1991, while Caleb and Joshua were home together after school, they got into a fight. Joshua threatened to kill Caleb. That evening, Joshua hit his father and left home without his parents' permission. Plaintiffs called the police and reported Joshua's running away.
Plaintiffs allege that on February 11, 1991, Joshua was late for school because he would not do his home chores. Plaintiffs told the Rolla High School Principal, defendant Roger Berkbuegler, about their decision to keep him from school until he finished his chores. Plaintiffs also asked Berkbuegler to tell them if he hears unusual allegations about Joshua because the boy gets authorities to work against each other. The next day, February 12, 1991, Joshua was again late to school because he would not do his home chores.
Plaintiffs allege that on February 13 a Rolla police officer went to their home about a report that Joshua had run away from home. Plaintiffs allege the officer told plaintiffs, "Why don't you get handcuffs and a *1378 leash, it's not illegal you know." The next day, February 14, 1991, plaintiff Kenneth Hawley ordered handcuffs.
Plaintiffs allege that on February 15, 1991, Joshua was again late for school because he did not do his home chores. Defendant Carl James[4] came to the plaintiffs' residence and asked Joshua's mother, plaintiff Margaret Hawley, to give custody of Joshua to him. James tried to convince Margaret that she did not want to keep Joshua. Plaintiffs allege that Margaret refused to give custody of Joshua to James. She explained to James that they (the plaintiffs) had been three years without Joshua and they were enjoying the last few months they had with him before he turned seventeen and could go anywhere he wanted.
Plaintiffs allege that on February 26, 1991, Joshua did not complete his home chores and stayed out of school the entire day. Because plaintiffs feared the school officials would complain to the PCDFS about their discipline technique of not allowing Joshua to attend school when he did not complete his chores, they spoke with school counselor Bradford at the PCDFS office. They told her about Joshua's choices to not complete his home chores and as a result he was not allowed to attend school until his chores were completed. Plaintiffs allege that Bradford told them that keeping Joshua out of school under those circumstances was not educational neglect.
Plaintiffs allege that on March 3, 1991, Joshua struggled with, hit, and wounded his father. After restraining Joshua with handcuffs, plaintiffs took him to the Rolla Police Department and requested that the police, the juvenile officer, or the PCDFS take custody of Joshua. An officer explained to them that none of those agencies could take Joshua because there was no place to put him. The officer did not unlock the handcuffs or otherwise indicate any disapproval of their using them to restrain Joshua. The officer lectured Joshua and sent everyone away, with Joshua still in handcuffs, expecting the plaintiffs to manage and control Joshua.
The next day, March 4, 1991, defendants Berkbuegler and Harmes allowed Joshua to be interviewed about home and family matters by Bradford and Winemiller in Harmes' office at the Rolla Public High School. This was done without notice to the plaintiffs and without obtaining their permission. On March 5 defendant Winemiller interviewed Margaret, Joshua, and Caleb at their home. Winemiller said nothing against the methods plaintiffs used to restrain Joshua's threatening and violent behavior or in any way indicated that restraining Joshua following an episode of violent and threatening behavior was abusive. She spoke with Joshua about the way he had been acting. There were no serious incidents of Joshua misbehaving from March 4 through March 23, 1991.
Plaintiffs allege that on March 24, 1991, Joshua became violent and out of control. He hit his mother and threatened to damage or destroy the house. He walked away from home handcuffed and called the police from the Rolla Bible Church. An officer responded to the call and met Margaret at the church. When the officer intended to enter the church and unlock the handcuffs, Margaret informed the officer that, if she (the officer) unlocked Joshua, she could have him because Joshua was a problem. The officer lectured Joshua in the church and left him locked in the handcuffs for the plaintiffs to manage and control. The officer did not disapprove of the manner in which plaintiffs were restraining Joshua's violent and destructive behavior.
Plaintiffs allege that on March 25, 1991, defendant Berkbuegler or defendant Harmes, or both, allowed defendant Don Nelson, a deputy juvenile officer, to interview Joshua either by telephone or in person at the school without notifying plaintiffs, without obtaining their parental permission, and without the parents' presence. Plaintiffs allege that, without first interviewing the parents and other witnesses to the alleged abuse of Joshua, without obtaining a court order, without giving the parents any notice or an opportunity to be involved in the decision concerning what should be done with their *1379 child, Nelson made the determination that Joshua would go and live with Keith and Charlene Wheeler. Plaintiffs allege that Nelson then filed false allegations of criminal child abuse with the Phelps County Prosecuting Attorney against the plaintiffs without first interviewing other known witnesses to the alleged crime.
Later on March 25, 1991, Rolla Police Sgt. E.W. Rapier interviewed the Hawley family at their residence about the events and problems of the previous day. Sgt. Rapier informed plaintiffs that, when the investigation of the child abuse allegations was over, Nelson may request that he remove Joshua from their home. If Joshua is removed, Rapier told plaintiffs, there would be a hearing in Juvenile Court within 24 hours to get a court order to transfer custody of Joshua from his parents or else Joshua would be returned to the plaintiffs. Then Rapier telephoned Nelson from the plaintiffs' residence and asked Nelson if he wanted Rapier to remove Joshua from his home. Nelson told Rapier to allow Joshua to remain in the home.
Plaintiffs allege that defendant James, acting in concert with Nelson's plan to transfer the custody of Joshua from plaintiffs to Keith and Charlene Wheeler, persuaded the Wheelers to accept custody of Joshua and arranged for them to take Joshua from the school into their home on March 26, 1991.
Plaintiffs allege that, although the Wheelers were told not to talk to plaintiffs, Keith and Charlene Wheeler came to plaintiffs' home on March 26, 1991, and informed them that there had been a meeting at the school and it was decided that Joshua was going to go live with them. The Wheelers told plaintiffs to get Joshua's possessions ready for them to pick up at 5:00 p.m. The Wheelers told plaintiffs that, if plaintiffs were not willing to cooperate, they would bring a police officer with them to get Joshua's things. Plaintiffs allege they told the Wheelers that they would not voluntarily give up custody of Joshua to them, but that the Wheelers could have Joshua after he turned 17 years of age on April 10, 1991.
Plaintiffs allege that defendant Berkbuegler and unnamed employees at Rolla High School failed to follow the school policy concerning students leaving the school grounds and allowed Joshua to leave school early on March 26, 1991, with Keith and Charlene Wheeler. This was done without giving plaintiffs any notice, without obtaining parental permission, and without a court order transferring custody of Joshua to the Wheelers. Plaintiffs allege that Joshua would not have been in imminent danger of harm had he been allowed to return home to plaintiffs. Plaintiffs allege that they arrived home before 5:00 p.m. to meet the Wheelers and the police officer, but they never came. A message on the telephone answering machine from defendant James told them to bring Joshua's clothes and personal papers to James' dental office by 5:00 p.m. Plaintiffs telephoned James and told him they would not bring Joshua's things to his office. James warned them that it would go easier on them to cooperate with the request to turn over Joshua's things.
Plaintiffs allege that Kenneth contacted Keith Wheeler by telephone at his residence about 6:15 p.m. on March 26, 1991. Kenneth asked whether or not Wheeler had Joshua. Wheeler admitted having Joshua at his residence. Kenneth asked Wheeler whether he would give Joshua back if they (the plaintiffs) came to Wheeler's residence to get him. Wheeler's response was, "If Dr. James tells me to." Plaintiffs contacted James about 8:30 p.m. on March 26, 1991. Plaintiffs told James about Wheeler's statement and asked James to call Wheeler and tell him to return Joshua to his parents. James refused to do so and referred them to the juvenile officer.
Plaintiffs allege that that night they complained to the Phelps County Sheriff's Department about the Wheelers having Joshua without their permission. A deputy sheriff telephoned Nelson who convinced the deputy sheriff to take no action on the complaint. In that conversation, Kenneth also spoke with Nelson. Plaintiffs allege that Nelson informed Kenneth that he had allowed Joshua to go home with the Wheelers, that Joshua was not in protective custody, and that the plaintiffs should calm down and let things cool off for a few days. Plaintiffs allege that, when asked if there would be a hearing in *1380 juvenile court the next day, Nelson advised Kenneth to talk to a lawyer because he was going to be arrested.
Plaintiffs allege that on March 27, 1991, Kenneth kept in contact with the juvenile office by telephone, inquiring about a juvenile court hearing concerning Joshua's custody. After Joshua had been in the Wheelers' custody for more than 24 hours, and no court order transferring custody having been issued, plaintiffs went to the Rolla High School to get Joshua before he went with the Wheelers.
Plaintiffs allege that at 3:00 p.m., on March 27, plaintiffs were arrested at the high school on a charge of child abuse. Plaintiffs allege that, before leaving the high school to be booked and jailed, they made arrangements for Caleb to stay with the Norman family. Defendants Nelson and Winemiller agreed with the arrangements which were made for Caleb. However, Winemiller informed the plaintiffs that, when they are released from jail, they were to talk with Nelson to obtain his approval before they regained custody of Caleb from the Normans. Plaintiffs allege they were then taken to the Rolla Police Department for processing. Thereafter, they were confined in the Phelps County jail. On that day, a felony complaint was filed against plaintiff Kenneth Hawley in the Associate Division of the Phelps County Circuit Court; a probable cause hearing was held; probable cause for the arrest and custody was found; and bail was set in the amount of $7,000. See Exh. I.
Plaintiffs allege that on March 27 Winemiller took Caleb to plaintiffs' home to get his clothes and possessions. While she was in the plaintiffs' home, without obtaining a search warrant or permission from the plaintiffs, defendant Winemiller seized some of Joshua's clothes and possessions. Plaintiffs then allege that Winemiller took Caleb to the Normans' residence.
Plaintiffs allege that thereafter defendant Nelson filed in the juvenile division of the Circuit Court of Phelps County, Missouri, a Request for Detention and a Petition, both styled In the interest of Caleb J. Hawley, Cause No. JU391-12. Plaintiffs allege that the request for detention and the petition both contained knowingly false allegations that were calculated to influence the court to assume jurisdiction over Caleb Hawley and to issue an order of detention. In the petition, which was signed by Nelson, he alleged:
a. On March 27, 1991 the natural parents of above named child were arrested by members of the Rolla Police Department for child abuse and placed in the Phelps County Jail.
b. Further, investigation reveals that there is no suitable adult to provide proper care for said above named child.
See Exh. D. Plaintiffs allege that on March 27, 1991, defendant Circuit Judge John D. Wiggins, acting solely upon the information furnished the court by the deputy juvenile officer, issued an order of detention in Caleb's case pending a hearing upon the petition which had been filed in the case. Plaintiffs allege that, without knowing that the plaintiffs had already arranged for Caleb to be cared for and supervised by the Normans, Judge Wiggins ordered Caleb detained and placed in the custody of the PCDFS. See Order of Detention, attached to complaint as Exh. E.
Plaintiffs allege that on March 27, 1991, defendant Don Nelson also filed with the Phelps County Circuit Court a Request For Detention and a Petition, both styled In the Interest of Joshua Hawley, Cause No. JU387-35J. See Exhs. F and G. Plaintiffs allege that the request for detention and the petition both contain false allegations. In the petition and the request for detention, which Nelson signed, he alleged:
a. On or about March 25, 1991, the above named juvenile did state to the Deputy Juvenile Officer that on March 24, 1991 the above named juvenile's natural parents had used chains and handcuffs on the above named juvenile on 2 separate occasions during that day.
b. Further investigation by the Deputy Juvenile Officer and the Rolla Police Department reveals that the natural parents of said above named juvenile had handcuffed and chained the above named juvenile to his residence on March 24, 1991 without any adult supervision.

*1381 c. Further, the above named juvenile is requesting that he be allowed to leave the residence of his natural parents because of the reported illegal restraints.
d. Further, Mr. and Mrs. Keith Wheeler ha[ve] agreed to allow the above named juvenile to reside in their home and to provide care and supervision for the above named juvenile.
See Exhs. F and G.
Plaintiffs allege that on March 27, 1991, Circuit Judge John W. Wiggins, acting solely upon information furnished the court by the deputy juvenile officer, issued an order of detention for Joshua Hawley pending a hearing upon the petition filed in his case. See Order of Detention attached to plaintiffs' complaint as Exh. H. The order of detention placed Joshua in the custody of the Wheelers.
On March 28, 1991, plaintiffs were brought before Associate Circuit Judge Mary Sheffield in the Circuit Court of Phelps County. At that time, plaintiffs were not represented by counsel. Plaintiffs allege, and the court's docket sheet recorded, that Judge Sheffield stated that the charge against plaintiffs is a felony and the law requires that all defendants in felony cases be represented by an attorney. See Docket Sheet, attached as Exh. I. Plaintiffs allege that this representation of the law by defendant Sheffield, that plaintiffs were required by law to be represented by counsel, was false and intentionally misleading.
Plaintiffs allege that, notwithstanding their request to represent themselves, they were ordered by Judge Sheffield to appear on April 17, 1991, with counsel. On March 29, 1991, plaintiffs applied to be represented by the state public defender. The application was later denied because the plaintiffs had resources of more than $500.
Plaintiffs allege that on March 29, 1991, after having received a copy of the Order of Detention regarding Caleb, which awarded custody of him to the PCDFS, plaintiffs signed an Agreement Regarding Placement giving their consent to allow the PCDFS to place Caleb in the home of the Normans until further arrangements could be made for his care.
In the afternoon of March 29, 1991, plaintiffs posted bond and were released from jail. They allege they telephoned defendant Nelson and told him about their release from jail and requested to regain custody of Caleb from the Normans. However, Nelson would not allow plaintiffs to resume custody of their son without their meeting with Nelson first. Nelson refused to meet with plaintiffs until Monday, April 1, 1991. During the discussion of March 29, Kenneth Hawley explained to Nelson that the family was planning to leave town on Sunday to be gone for a week, that they planned to camp out and attend religious meetings, and that Caleb wanted to go on this trip. Plaintiffs allege that defendant Nelson told them that they could either change their plans and meet with him on Monday, April 1, or go without Caleb and meet with him after they return. Plaintiffs changed their plans and arranged to meet with Nelson on Monday, April 1. In doing this, plaintiffs missed scheduled religious convocations which they would have attended had they taken their trip as planned.
On March 29 and April 1, 1991, plaintiffs allege they consulted with defendant Russell Carnahan, Esq., and informed him that they wanted to represent themselves but Judge Sheffield was making them get a lawyer, that they were falsely charged with a felony, that a meeting with the prosecuting attorney should result in a dismissal of the charge, that the prosecuting attorney would not talk to plaintiffs unless they had a lawyer, that they had been required to have a lawyer, and that a preliminary hearing was set for April 24, 1991. During this meeting, plaintiffs allege, defendant Carnahan did not inform them that they had a constitutional right to represent themselves in court. He expressed a willingness to assume the role of the plaintiffs' attorney to represent them up to the conclusion of the preliminary hearing for $1,000. For an additional $3,000 he would represent plaintiffs through a trial on the felony charge.
Plaintiffs allege that in the morning of April 1, 1991, they met with defendant Nelson. During that meeting, Nelson required *1382 that they meet him and defendant Lynn Slawson, an employee of the PCDFS, at the PCDFS office at 2:30 p.m. Nelson informed plaintiffs that, in order to get Caleb back, plaintiffs must cooperate with Slawson and the PCDFS and that plaintiffs must sign a Service Agreement, agreeing to have regular home visits and attend parenting classes. He said that their failure to cooperate would cause the termination of plaintiffs' parental rights. Plaintiffs allege they agreed to cooperate in order to get custody of Caleb back and to avoid further juvenile court action to terminate their parental rights.
Plaintiffs allege that defendant Nelson then refused to allow plaintiffs to recover custody of Caleb if they were going to leave town for the week as planned. If plaintiffs promised Nelson they would stay at home with Caleb and not take him with them to the meetings and camping for the week, then they could get Caleb back that day. Nelson stated that it was stressful for Caleb to see his parents arrested and to be in foster care with the Normans. Therefore, Nelson stated, Caleb needed to stay at his own home with his parents instead of being exposed to the additional stresses of travel, attending meetings, and camping.
Plaintiffs allege that, because they had a religious obligation to attend the convocation meetings, they chose to leave Caleb with the Normans and to attend what remained of the scheduled convocations. Plaintiffs allege that, during the week plaintiffs attended these religious convocations, while Caleb stayed at the home of the Normans, Caleb suffered a fainting spell and physical weakness requiring bed rest for several days.
Plaintiffs allege they returned home on April 8, 1991, and regained custody of Caleb from the Normans. On April 9, 1991, they signed a written Service Agreement under threat of losing custody of Caleb and having their parental rights terminated.
On April 9, plaintiffs appeared before Judge Sheffield and asked for a court appointed attorney since they were turned down by the public defender and did not have the money available to hire private counsel. However, Judge Sheffield denied the request for a court appointed attorney due to plaintiffs' resources. Defendant Sheffield again told the plaintiffs to obtain counsel by April 17, 1991. Plaintiffs allege they requested to represent themselves. They stated to Judge Sheffield that they were falsely charged and a simple meeting with the prosecuting attorney, the plaintiffs, the alleged victim, and his brother would result in a dismissal of the charge. However, the prosecutor would not talk to them unless they had a lawyer. Judge Sheffield advised the plaintiffs that they were facing imprisonment for seven years and a fine of up to $5,000, and that the law required them to be represented by an attorney since they are charged with a felony. Sheffield insisted that she must obey the law by requiring that the plaintiffs be represented by an attorney.
On April 10, 1991, Joshua Hawley turned 17 years old. On April 11, 1991, an order captioned Release From Detention Upon Change in Circumstances was issued in Caleb's case by Judge Wiggins. The order provided for the release of Caleb from foster care, his return to the care of his parents, and that the PCDFS would retain the legal custody of Caleb under the continued supervision and jurisdiction of the court. See Exh. J. The deputy juvenile officer and the PCDFS were allowed to provide information to the court for the issuance of the order, but the plaintiffs were not given notice or an opportunity for a hearing on the matter.
Plaintiffs allege that on or about April 12, 1991, Joshua moved out of the Wheelers' home and was no longer in their physical custody. On April 15, 1991, plaintiffs filed a written motion with the Phelps County Circuit Court, Juvenile Division, captioned Motion for Reassignment of Custody, asking the juvenile court to reassign custody of Joshua to them, because of threats that had been made against Caleb and their lives and property. See Exh. K. Copies of the motion were hand delivered to defendants Nelson and Wiggins that same morning.
Plaintiffs allege that on April 15, sometime after the filing of their motion, defendant Associate Circuit Judge Ralph Haslag issued an Order Terminating Jurisdiction in Joshua's case stating:

*1383 ... it being found by the Court that the above named juvenile is no longer in need of care and treatment which this Court may provide.
"IT IS ORDERED that the jurisdiction of this Court over the above named juvenile be terminated, and that the above named juvenile be discharged from further supervision by this Court."
See Exh. L. Plaintiffs allege that Judge Haslag made this finding without giving them notice or any court hearing on the matter.
Plaintiffs allege that on April 16, 1991, they made arrangements with Russell Carnahan to make monthly payments on the $1,000 fee he required to represent them through the preliminary hearing. Further, pursuant to Judge Sheffield's order that they be represented by an attorney, plaintiffs arranged for Russell Carnahan to enter his appearance as their counsel. On April 24, 1991, the preliminary hearing was continued until May 15, 1991.
Plaintiffs allege that on May 15, 1991, defendant Carnahan negotiated the dismissal of the felony charge as part of a proposed plea bargain agreement for a misdemeanor third degree assault charge. Plaintiffs allege that they accepted the offer in order to avoid having to pay an additional $3,000 in attorney's fees, which would have been required for them to prove their innocence of the felony they were charged with committing.
Plaintiffs allege that they successfully completed their obligations under the terms of the written service agreement with the PCDFS that was signed on April 9, 1991.
Plaintiffs allege that on July 24, 1991, they met with defendant Slawson at the PCDFS office and signed another written service agreement which was required by the PCDFS. At that time, plaintiffs informed Slawson that they did not get a hearing in Juvenile Court on Joshua's case and that they had also not been notified of any scheduled hearing in Caleb's case. At that time, plaintiffs requested of Slawson a hearing in Juvenile Court in Caleb's case. Slawson told plaintiffs that Nelson does whatever he wants to do and that, if she learns of a scheduled hearing, she would let plaintiffs know of it.
Plaintiffs allege that on October 4, 1991, defendant Slawson closed the protective services case on Caleb, effectively releasing the plaintiffs from being required to receive more services from the PCDFS.
On October 21, 1991, Judge Sheffield issued an Order Terminating Jurisdiction in Caleb's case stating:
... it being found by the Court that the above named juvenile is no longer in need of care and treatment which this Court may provide
IT IS ORDERED that the jurisdiction of this Court over the above named juvenile be terminated, and that the above named juvenile be discharged from further supervision by this Court.
See Exh. M. Plaintiffs allege that Judge Sheffield made this order without allowing the plaintiffs notice or hearing. Plaintiffs also allege that the order terminating jurisdiction made no change to the custody arrangement that was implemented by the April 11, 1991, order; that legal custody remained with the PCDFS and physical custody remained with the plaintiffs, only without the jurisdiction and supervision of the court.

Motions to dismiss.
Defendants' motions to dismiss are directed against the very factually specific allegations made by the plaintiffs in their complaint. In deciding the motions to dismiss, the Court must consider the plaintiffs' allegations to be true, and the Court must consider them in the light most favorable to the plaintiffs. Jenkins v. McKeithen, 395 U.S. 411, 421-22, 89 S.Ct. 1843, 1848-49, 23 L.Ed.2d 404 (1969); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir.1994).
Each of the defendants seeks dismissal of this judicial action for several reasons, including lack of subject matter jurisdiction, the failure to state a claim upon which relief can be granted, for absolute immunity, for qualified immunity, and as barred by the applicable statute of limitations, the doctrines of claim and issue preclusion, and the Eleventh *1384 Amendment to the Constitution of the United States.
Defendants argue that this Court is without jurisdiction of the subject matter of the action, because by this action plaintiffs seek a review of the orders of the state circuit court regarding their domestic proceeding. As defendants argue, this Court has no authority to sit as a court of appeals to review the determinations made by the Circuit Court of Phelps County,[5] and this Court is obliged to honor the determinations of the Missouri court. See Malachowski v. City of Keene, 787 F.2d 704, 708 (1st Cir.), cert. denied, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); 18 Wright, Miller & Cooper, Federal Practice and Procedure, § 4469, pp. 659-674 (1981 ed.).
However, this Court perceives from plaintiffs' complaint that nowhere do they seek appeal-like review of the state court determinations. Rather, plaintiffs pray for compensatory and punitive monetary damages for alleged violations of their rights, a declaratory judgment stating their rights, and injunctive relief aimed at changing what is described as an unconstitutional practice or policy of the state circuit court. All of the relief sought under § 1983 is premised upon plaintiffs' claims that their federal constitutional rights were violated. The Court concludes that it has subject matter jurisdiction over plaintiffs' § 1983 claims. See 28 U.S.C. § 1343.
Defendants argue that this suit is barred by the applicable statute of limitations. The Court disagrees. Section 1983 has no explicit statute of limitations. However, the Supreme Court has determined that the most analogous state statute of limitations to be applied to § 1983 actions is the one for general personal injuries. Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). For § 1983 claims arising in Missouri, that statute is the general five-year statute for personal injuries, Mo. Rev.Stat. § 516.120, not § 516.130 (three year period for actions brought against officials) as argued by defendants. See Lovejoy v. Goodrich, 798 F.2d 1201, 1202 (8th Cir. 1986).
As set forth above, plaintiffs seek relief from these defendants under 42 U.S.C. § 1983. When seeking relief against a defendant under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and that the alleged action deprived the plaintiffs of a right secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912-13, 68 L.Ed.2d 420 (1981); Mayard v. Hopwood, 105 F.3d 1226, 1227 (8th Cir.1997). Liability under § 1983 does not extend to entirely private conduct which assertedly violates federal constitutional rights; it extends only to those persons who act with the authority of a state and represent it in their capacity. National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191, 109 S.Ct. 454, 461-62, 102 L.Ed.2d 469 (1988).
The Court disagrees with defendants that this federal action is barred by any determination made by the Circuit Court of Phelps County. As set forth above, the Court does not perceive that plaintiffs are asking this Court to review issues decided by that court. Cf., Jones v. Moore, 996 F.2d 943, 944 (8th Cir.1993).
To the extent that any of plaintiffs' claims are barred by the Eleventh Amendment, the Court will discuss this defense below.
In determining whether plaintiffs have stated claims upon which relief can be granted, the Court is mindful that the complaint may be dismissed "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

Counts 1 and 2:

Interviews of March 4 and 25, 1991.
Defendant Kent King is the superintendent of the public school district which includes Rolla High School. Defendant Roger *1385 Berkbuegler is the principal of Rolla High School. Defendant Kaye Harmes is a Rolla High School counselor. Defendant Wayne Langston is the director of the PCDFS. Defendant Russell Sheldon is the juvenile officer of the Circuit Court of Phelps County. Defendant Donald Nelson is the chief deputy juvenile officer of the Circuit Court of Phelps County. Defendants Lynn Slawson and Caroline Bradford are employees of the PCDFS.
In Counts 1 and 2 of their complaint, plaintiffs allege that these defendants, acting under color of state law, deprived them of rights, privileges, and immunities secured by the Constitution of the United States. More specifically, plaintiffs advert to the alleged actions of these defendants on March 4 and 25, 1991, and allege that Harmes and Berkbuegler unlawfully allowed Winemiller, Bradford, and Nelson to interview Joshua at the Rolla High School without a court order, without notifying plaintiffs, without their permission, and without allowing them to be present during the interviews.
Plaintiffs allege that the unauthorized interviews or contacts with Joshua by various state officials violated their clearly established constitutional rights including, but not limited to, their right to privacy, their right to due process, their right to control and direct the education of their child, and their right to exist as a family unit free from unwarranted intrusion by the government.
Plaintiffs allege that defendant Kent King is also liable for the unconstitutional actions of defendants Harmes and Berkbuegler, because King, as the superintendent of the Rolla School District, failed to properly train and supervise Harmes and Berkbuegler, who plaintiffs allege have frequently acted similarly with respect to other students.
Defendants argue in their motions to dismiss that, in the factual context of the complaint's allegations, plaintiffs have failed to allege a violation of any constitutional right. Defendants also argue that, in the face of any relevant constitutional right, they are protected by qualified immunity.
The Eighth Circuit Court of Appeals has described the constitutional considerations of parental rights as follows:
Our court has recognized the liberty interest which parents have in the care, custody, and management of their children.... However, we have at the same time indicated that this right is not absolute.... As we stated in [Myers v. Morris, 810 F.2d 1437 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987)], "the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." 810 F.2d at 1462. Moreover, as the First Circuit has correctly noted, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." Watterson v. Page, 987 F.2d 1, 8 (1st Cir.1993).
The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome. Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable.... Our court has not gone so far as to say that there are no "clearly established" substantive due process rights held by parents in the context of child abuse investigations. However, in Myers, we did recognize the problem of defining such rights. 810 F.2d at 1462-63. More generally, this need to balance competing interests makes the Siegert approach difficult to apply in child abuse cases involving the right to familial integrity. [] In these types of cases, it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis....
Clearly, our precedents provide that, when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly *1386 founded upon a reasonable suspicion of child abuse.
Thomason v. SCAN Volunteer Services, Inc., 85 F.3d 1365, 1370-71 (8th Cir.1996) (quoting Manzano v. South Dakota Dept. of Social Servs., 60 F.3d 505, 509-11 (8th Cir.1995)); see also Zakrzewski v. Fox, 87 F.3d 1011, 1014 (8th Cir.1996).
In Thomason parents brought a civil rights action under 42 U.S.C. § 1983 after their child was removed from their home by Arkansas child welfare authorities on account of suspected parental child abuse. The authorities acted upon the reports of a physician and obtained an ex parte order removing the child from the parents and placing him in the protective custody of the state. After the parents had an opportunity to contest the matter, the state court quashed the ex parte order, the allegation of abuse was dismissed, and the child was returned to the parents. The federal district court dismissed the claims against the defendants on the basis of the Eleventh Amendment and qualified immunity. The Court of Appeals affirmed, determining that the responses by the welfare authorities to the doctor's reports, although the reports were based upon circumstantial evidence, were not so disproportionate under the circumstances to rise to the level of a constitutional deprivation.
According to the plaintiffs' allegations in the lawsuit before this Court, when the interviews of March 4 and 25 occurred, Joshua's difficult relationship with plaintiffs was well known to the officials. Joshua earlier had been placed by the juvenile court with other relatives for three years. On February 11, 12, and 15 Joshua was late arriving at school because he had not completed his home chores. On February 26, he did not attend school at all. On March 3, plaintiffs handcuffed Joshua and took him to the police department. Joshua had left home while physically restrained and had telephoned the police.
Plaintiffs' admitted refusal to allow Joshua to attend high school on the days he did not first complete his home chores, a family policy well known to the school officials, and which became known to the employees of PCDFS, and plaintiffs' practice of handcuffing Joshua, were reasonably considered to be probable cause to believe that Joshua was being subjected to a form of neglect or abuse arguably prohibited by Missouri state law. See Mo.Rev.Stat. §§ 167.031.1, 167.061, 210.110 (1986).[6] The school officials, defendants Berkbuegler and Harmes, were obligated by state statute to report to the PCDFS any observed information about suspected neglect of Joshua. See Mo.Rev.Stat. §§ 210.115.1, 210.130 (1986); Fitzgerald v. Williamson, 787 F.2d 403, 405 n. 3 (8th Cir.1986). Missouri law protects these defendants from liability for making such required reports. See Mo.Rev.Stat. § 210.135 (1986).
Upon receiving such a report, the PCDFS was required to undertake "a thorough investigation." See Mo.Rev.Stat. § 210.145.6 (1986). Such a thorough investigation would reasonably include an interview with the child, the subject of the suspected neglect.
In the context of the investigation alleged by the plaintiffs, a failure to give the plaintiffs notice of the intended interviews, to secure plaintiffs' permission for the interviews, or to allow plaintiffs to be present during the interviews, protected the state's very strong interests in protecting the child and learning in timely fashion what the child had to relate about the matter, without being possibly limited by the presence of his parents. J.B. v. Washington County, 905 F.Supp. 979, 986-87 (D.Utah 1995). This interest was paramount to the personal interests of the plaintiffs in preventing false accusations. Landstrom v. Illinois Dept. of Children and Family Serv., 892 F.2d 670, 674-78 (7th Cir.1990). Parents are not entitled to participate in child abuse investigations with the authorities. Manzano v. S. Dak. Dept. of Soc. Serv., 60 F.3d 505, 510 (8th Cir.1995).
Furthermore, any constitutionally protected parental and personal interests of the plaintiffs in the governmental activities that affected Joshua could be vindicated by a later judicial proceeding and remedy. See Mo. Rev.Stat. §§ 210.152, 211.251(2); see also *1387 Doe v. Hennepin County, 858 F.2d 1325, 1329 (8th Cir.1988), cert. denied, 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989); Fitzgerald v. Williamson, 787 F.2d 403, 408 (8th Cir.1986); Bohn v. County of Dakota, 772 F.2d 1433, 1438-39 (8th Cir. 1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986).
Thus, this Court determines from the explicit allegations of the plaintiffs that no alleged constitutional right of theirs was violated by the actions of the defendants.
If, however, plaintiffs have stated a claim upon which relief can be granted in Counts 1 or 2 that these defendants violated a constitutional right of plaintiffs, which the Court does not determine, the Court further concludes that these defendants are protected by the defense of qualified immunity. Qualified immunity is based upon an objective standard:
government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The question of whether a defendant is entitled to qualified immunity is a question of law to be determined by the trial court. McIntosh v. Arkansas Republican Party-Frank White Election Committee, 856 F.2d 1185, 1186 (8th Cir.1988). Qualified immunity is available (1) if the law as it relates to the relevant facts was not clearly established or (2) if a reasonable official could have believed the alleged conduct was lawful in light of the clearly established law. Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39. See also Mahers v. Harper, 12 F.3d 783, 785 (8th Cir.1993).
The question of whether the law is clearly established is not to be determined in the abstract. It must be established that the law is sufficiently clear in the context of the specific facts alleged so that a reasonably competent official would understand that what he or she is doing violates the individual's rights. Anderson v. Creighton, 483 U.S. 635, 640-41, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987).
In the evolving factual scenario of possible child neglect under Missouri law and the concomitant state law obligations of reporting and investigating, this Court determines that the constitutional rights asserted by the plaintiffs in Counts 1 and 2 were not sufficiently clear and established, at the time of the alleged acts, that a reasonably competent official would understand that what the defendants did, as alleged by the plaintiffs, violated any of plaintiffs' constitutional rights. The facts alleged by the plaintiffs, described above, established that by March 4, 1991, the defendants had a reasonable suspicion of neglect and child abuse, which they were required to investigate. The response of the authorities, at first limited to interviews with the plaintiffs, and then involving placement with foster parents, was not disproportionate to the circumstances of the situation. The mere requirement that a determination of the rights of the plaintiffs requires a comparison and weighing of the interests of the state with the interests of the plaintiffs, in the facts alleged by plaintiffs, establishes that any paramount constitutional rights of the plaintiffs' rights were not clearly established and defendants are entitled to qualified immunity from suit. Manzano, 60 F.3d at 510.
Plaintiffs allege that defendant Kent King is liable for the unconstitutional actions of defendants Harmes and Berkbuegler, because King, as the superintendent of the Rolla School District, failed to properly train and supervise[7] Harmes and Berkbuegler, who plaintiffs allege have frequently acted similarly with respect to other students. Plaintiffs assert similar liability against defendant Langston based upon his position as the director of the PCDFS. Liability against defendant Sheldon is asserted upon his position as circuit court juvenile officer. The alleged liability of these defendants is derivative *1388 of that of Berkbuegler, Harmes, Winemiller, Bradford, and Nelson. Myers v. Morris, 810 F.2d at 1464. Because the plaintiffs have failed to state a claim upon which relief can be granted against defendants Berkbuegler, Harmes, Winemiller, Bradford, and Nelson in Counts 1 and 2, they also fail to state a claim against defendants King, Langston, and Sheldon in those counts.
For these reasons, Counts 1 and 2 must be dismissed with prejudice.

Count 3:

Transferring custody of Joshua to Wheelers on March 26, 1991,
Defendants Carl James and Charlene Wheeler[8] are alleged to have acted in concert[9] with defendant Nelson, the chief deputy juvenile officer, under color of state law, as the agents of defendant Nelson in the transfer of the custody, care, and control of Joshua from the plaintiffs to Keith and Charlene Wheeler on March 26, 1991, without a court order or other legal authority, and in violation of Mo.Rev.Stat. §§ 453.110 and 565.110. Plaintiffs allege that defendants violated their constitutional rights to privacy, to be free from unreasonable searches and seizures, to due process, to control and direct the education of their child, and their right to exist as a family unit free from unwarranted intrusion by the government.
Defendant James argues that the claims against him must be dismissed as barred by the five-year statute of limitations. This action was commenced with the filing of the plaintiffs' complaint on March 4, 1996. Therefore, plaintiffs' claims which antedate March 4, 1991, generally are outside the statutory period of limitations. However, plaintiffs have made specific allegations against defendant James that he acted to violate their rights within the limitations period. Plaintiffs allege that James, acting in concert with defendant Nelson, to transfer the custody of Joshua from plaintiffs to Keith and Charlene Wheeler, persuaded the Wheelers to accept custody of Joshua and arranged for them to take Joshua from the school into their home on March 26, 1991, within the limitations period. Plaintiffs also allege that on March 26, 1991, defendant James left a message on their telephone answering machine, directing them to bring Joshua's clothes and personal papers to James' dental office by 5:00 p.m. When plaintiffs telephoned James and told him they would not bring Joshua's things to the office, James is alleged to have warned them that it would go easier on them to cooperate with the request to turn over Joshua's things. Whether or not these are violations of plaintiffs' rights, they are allegations of facts which occurred within the five year statute of limitations.
Defendant James argues that his alleged actions were not taken under color of state law. The allegations of the plaintiffs clearly are that James acted in concert with defendant Nelson, the circuit court juvenile officer. Allegations that a private person acted jointly with a state official are sufficient to allege that he acted under color of state law, for the purposes of § 1983. Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). For the same reasons, the claims brought against defendant Wheeler under 42 U.S.C. § 1983 sufficiently allege that she acted in concert with defendant Nelson to show that she acted under color of state law. Without such allegations, James and Wheeler, standing alone in positions of foster parents, in the facts alleged by plaintiffs, did not act under color of state law. See Lintz v. Skipski, 807 F.Supp. 1299, 1306 (W.D.Mich.1992), aff'd, 25 F.3d 304 (6th Cir.), cert. denied, 513 U.S. 988, 115 S.Ct. 485, 130 L.Ed.2d 397 (1994).
The question remains whether plaintiffs have sufficiently alleged that defendant Nelson, in acting to protect Joshua by placing him in the care of foster parents, violated a *1389 clearly established federal right of the plaintiffs.
In Count 3, plaintiffs allege that Nelson, after plaintiffs had kept Joshua home from school because he did not perform his chores, which arguably was an act of neglect under Missouri law, and after plaintiffs had resorted to handcuffing Joshua, and after Joshua had left his parents' home while handcuffed, and after Nelson had interviewed Joshua, Nelson decided that Joshua should not remain in the family residence and made plans for him to live with the Wheelers. Nelson is also alleged to have arranged for the Wheelers to take Joshua from his school, all before March 27, 1991. On March 27, Nelson filed his petition for Joshua's detention and on that day the circuit court granted the petition.
Nelson's actions, before the issuance of the court order for detention, were authorized by Missouri law. When there is reasonable cause to believe, as in this case, that Joshua was the subject of neglect or abuse, to avoid the perceived danger of personal harm by Joshua remaining in his parents' residence, a juvenile officer, such as Nelson, may take the juvenile into temporary protective custody.[10]See Mo.Rev.Stat. §§ 210.125.1, 210.125.4 (1986). Placement with a foster parent is authorized to implement temporary protective custody. Mo. Rev.Stat. § 210.125.5 (1986). Under the facts alleged by plaintiffs, the Wheelers took Joshua into their protective custody when they picked him up at school on March 26. Under Missouri law, the jurisdiction of the juvenile court commenced when Joshua was taken into protective custody. See Mo.Rev. Stat. § 210.125.3 (1986). The next day, the circuit court issued its order of detention, pursuant to Mo.Rev.Stat. § 210.125.4 (1986).
Under these circumstances, and acting pursuant to Missouri law, any right of the plaintiffs in preventing Joshua from being taken into such custody was not clearly established. Defendant Nelson is, therefore, protected from liability by qualified immunity. Meyers v. Contra Costa County Dept. of Soc. Serv., 812 F.2d 1154, 1158-59 (9th Cir.), cert. denied, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987). Because Nelson is protected from liability by qualified immunity, so are defendants James and Wheeler, because the asserted rights of plaintiffs were not clearly established.
Plaintiffs also allege in Count 3 that defendant Sheldon is liable for the actions of defendant Nelson due to his failure to properly train and supervise Nelson. Because defendant Nelson violated no clearly established federal right of the plaintiffs, defendant Sheldon is not liable for any failure to train or supervise Nelson. Myers, 810 F.2d at 1464.

Count 4:

Allowing Joshua to leave school on March 26, 1991.
Plaintiffs allege that on March 26, 1991, unnamed employees of the Rolla High School and school principal Berkbuegler willfully and unjustifiably allowed Joshua to leave the high school grounds with Keith and Charlene Wheeler, before school was dismissed for the day, without a court order, without notifying Joshua's parents, and without parental permission, knowledge, or consent. This, they allege, violated the Rolla High School policy regarding students leaving school grounds early and plaintiffs' clearly established constitutional rights. Plaintiffs claim that these defendants violated their constitutional rights to privacy, to due process, to control and direct the education of their child, and to exist as a family unit free from unwarranted intrusion by the government.
Defendant Berkbuegler argues, and the Court agrees, that he is protected from liability under this count because of qualified immunity. Plaintiffs allege that Nelson, the county juvenile officer, told them that he had allowed Joshua to go home with the Wheelers, although Joshua was not in protective custody. Thus, the scenario presented to Berkbuegler, as alleged by plaintiffs, involved the Wheelers being allowed by the *1390 county juvenile officer to accept Joshua into their home apparently on a foster parent basis, with everyone's knowledge of facts which arguably established probable cause to believe that Joshua was the victim of neglect and abuse. Because Missouri law provided for a juvenile officer taking a juvenile into protective custody, the school personnel, including the "unnamed employee(s) at Rolla High School,"[11] reasonably acted to cooperate with these authorities. For the school personnel to decide to do otherwise under the federal Constitution would require them to compare the interests of the plaintiffs and the interests of the state and of the juvenile officer and to decide that the parents' rights were paramount.
The mere requirement that a determination of the rights of the plaintiffs requires such a comparison and weighing of the competing interests, in the facts alleged by plaintiffs, establishes that, plaintiffs' rights were not clearly established and defendants are entitled to at least qualified immunity from suit. Manzano, 60 F.3d at 510.
Plaintiffs also allege that defendant King, as the superintendent of the Rolla School District, is liable for unconstitutional actions of school personnel, including principal Berkbuegler, because of defendant King's failure to properly train and supervise them. Plaintiffs fail to state a claim against defendant King, because, under the facts alleged by plaintiffs, a determination of plaintiffs' federal constitutional rights involve a weighing and comparison of the interests of the plaintiffs and of the state and the school district in protecting the child, in the facts presented to the defendants. Under such circumstances, defendant King could not have had any notice that the actions of defendant Berkbuegler, as alleged by plaintiffs, would violate plaintiffs' rights. City of Canton v. Harris, 489 U.S. 378, 389-91, 109 S.Ct. 1197, 1205-06, 103 L.Ed.2d 412 (1989); Thelma D. by and Through Delores A. v. Bd. of Educ., 934 F.2d 929, 934-35 (8th Cir.1991).
Therefore, plaintiffs have failed to state a claim against any defendant[12] under Count 4.

Count 5:

Seizure of Joshua's clothes on March 27, 1991.
Plaintiffs allege that on March 27, 1991, defendant Winemiller, a PCDFS employee, went with Caleb to their residence to obtain clothes for Caleb so that he could go and live with the Normans, as the plaintiffs had arranged. While in the home with Caleb, plaintiffs allege that Winemiller also seized some of Joshua's clothes and possessions without a court order, a search warrant, the consent or permission of the plaintiffs, and without the plaintiffs' presence. Plaintiffs claim that this unauthorized seizure of property from the plaintiffs' residence violated plaintiffs' constitutional rights to privacy, to due process, and to be free from unwarranted searches and seizures. Plaintiffs allege that Winemiller must have known that the Wheelers needed clothes for Joshua and that plaintiffs did not turn over to the Wheelers or to James any of Joshua's clothes as requested on March 26, 1991, and that plaintiffs were not willing to relinquish his clothes or possessions without a court order.
The Court agrees with defendant Winemiller that she is protected from liability by qualified immunity. When defendant Winemiller entered plaintiffs' home it was not to search for evidence of crime or juvenile neglect or abuse. Rather, under the allegations of the plaintiffs in their complaint, Winemiller entered to obtain Joshua's possessions for the transfer of his custody to the Wheelers. Plaintiffs do not allege that she violated any constitutional right of theirs *1391 when she entered the residence for this purpose. The only issue before this Court is whether she violated any right of the plaintiffs by also obtaining clothes for Joshua.
Under the facts alleged by plaintiffs, any federal constitutional right in them to prevent Winemiller from gathering Joshua's clothes, after she was in the residence, was not clearly established, if it existed at all. Ostensibly, Joshua had the right to enter the residence where he resided with the plaintiffs and to obtain his own possessions. As a PCDFS employee who knew that the Wheelers had taken custody of Joshua at the high school and that the juvenile officer had directed that Joshua should live with the Wheelers, she accompanied Caleb, a resident of the home, for the purpose of obtaining his things. She also could reasonably be expected to be authorized to also acquire items of property needed by Joshua. Under plaintiffs' allegations, they and the children were joint occupants of the residence and any one of them, including Caleb or Joshua, even though minors, were arguably constitutionally authorized to consent to Winemiller obtaining Joshua's clothes. Lenz v. Winburn, 51 F.3d 1540, 1548-49 (11th Cir.1995) (consent to search voluntary when given by a 9-year-old with common authority over the residence). Therefore, plaintiffs have failed to state a claim against defendant Winemiller upon which relief can be granted.
Plaintiffs claim that defendant Langston is also liable for the actions of defendant Winemiller due to his failure to properly train and supervise her. Because she is protected by qualified immunity, the asserted constitutional right or rights of the plaintiffs not being clearly established, plaintiffs fail to state a claim against him for a failure to train and supervise her.
Count 5 must be dismissed.

Count 6:

Filing false allegations on March 27, 1991,
Plaintiffs allege that on or about March 27, 1991, defendant Nelson filed false and misleading allegations with the Juvenile Court and with the prosecuting attorney, thereby violating plaintiffs' constitutional rights to privacy, to due process, and to exist as a family unit free from unwarranted intrusion by the government. Plaintiffs allege that Nelson knew that the false and misleading allegations concerning Joshua and Caleb would likely influence the Juvenile Court to issue orders of detention for Joshua and Caleb. Thereby custody of Joshua would be placed with the Wheelers. They allege that getting a court order would lend a legal appearance and cover up the unconstitutional and criminal transfer of custody to the Wheelers without a court order, which Nelson had already accomplished the previous day with the assistance of James and Wheelers.
Plaintiffs do not allege that Joshua and Caleb did not give statements that they were restrained by plaintiffs with handcuffs and chains; indeed, the allegations of the plaintiffs indicate that they were advised to do so by various law enforcement personnel and that they in fact did so. The facts alleged by plaintiffs indicate that these defendants acted in an objectively reasonable manner.
Plaintiffs also allege that, in an attempt to prevent the plaintiffs from having an opportunity for a hearing where the false and misleading allegations could be brought to the attention of the Juvenile Court, Nelson failed to follow the practice and policy of the Juvenile Court by not filing, along with the petitions, a request to the juvenile court clerk for a summons to be issued to the parents to require their presence at a jurisdictional hearing on the false and misleading allegations contained in the petitions.
Under the allegations of the plaintiffs, defendant Nelson did not violate plaintiffs' rights. The factual allegations made to the juvenile division of the circuit court, which support a determination of probable cause, are undisputed by plaintiffs, i.e., that plaintiffs had been arrested for child abuse, that they had physically restrained at least Joshua, and that they had prevented Joshua from attending school for failure to complete his chores. Any failure of the court to issue a summons to plaintiffs on the petitions was remedied by the actual notice received by the plaintiffs about the proceedings.
*1392 Further, defendant Nelson is absolutely immune from liability for his role as a juvenile officer in initiating the juvenile court proceedings. In this respect his action was "functionally comparable to that of a prosecutor." Thomason v. SCAN Volunteer Services, Inc., 85 F.3d 1365, 1373 (8th Cir.1996). In such a role, prosecutors are absolutely immune from civil liability for their actions in initiating court proceedings. Imbler v. Pachtman, 424 U.S. 409, 423, 96 S.Ct. 984, 991-92, 47 L.Ed.2d 128 (1976); Myers v. Morris, 810 F.2d 1437, 1452 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). The important principle underlying such immunity from suit was set forth in Meyers v. Contra Costa County Dept. of Soc. Serv., 812 F.2d 1154 (9th Cir.), cert. denied, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987):
Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.
812 F.2d at 1156; see also, Mazor v. Shelton, 637 F.Supp. 330, 334-35 (N.D.Cal.1986).
Nelson is also protected from liability by the absolute immunity afforded to witnesses for his role in providing information to the state circuit court upon which it acted. Thomason v. SCAN Volunteer Services, Inc., 85 F.3d at 1373; Doe v. Hennepin County, 858 F.2d 1325, 1329 (8th Cir.1988); Myers v. Morris, 810 F.2d at 1466.
Plaintiffs also allege that Nelson filed false and misleading allegations of criminal child abuse with the Phelps County Prosecuting Attorney after interviewing Joshua, and making no attempt to interview Caleb or the plaintiffs who were also witnesses to any alleged abuse. Plaintiffs allege that the misleading and false allegations were calculated to influence the prosecuting attorney to file criminal charges against the plaintiffs based upon unsubstantiated testimony. For the reasons set forth above, the Court determines that this claim also is barred by the absolute immunity granted to witnesses.
Plaintiffs allege that defendant Sheldon is liable for the actions of defendant Nelson due to his failure to properly train and supervise Nelson. The Court has decided above that, based upon the allegations of the plaintiffs, defendant Nelson has violated no constitutional right of the plaintiffs. As a consequence, plaintiffs do not state a claim against defendant Sheldon upon which relief can be granted.
Count 6 must be dismissed.

Counts 7 and 8:

Judicial actions.
Plaintiffs allege that, after petitions were filed in both Caleb's case and Joshua's case in the juvenile division of the circuit court, that court failed to issue any summons to the plaintiffs for a hearing as required by Mo. Rev.Stat. § 211.101.[13] Plaintiffs seek relief against the circuit court as a unit; Circuit Judge Douglas E. Long, the presiding judge of the circuit court; and Circuit Judges John Wiggins, Ralph Haslag, and Mary Sheffield. Plaintiffs claim that the failure of the court to provide them with notice of the filing of the petitions violated their constitutional rights to substantive and procedural due process and their right to exist as a family unit free from unwarranted intrusion by the government.
*1393 Plaintiffs also allege that the circuit court has a practice and a custom of allowing defendant Nelson to file a letter with the juvenile court clerk requesting that a summons be issued for a hearing on the petitions that he files. If Nelson fails to request the summons and a hearing date, the juvenile court clerk does not issue a summons or docket a hearing. Likewise, plaintiffs allege, the juvenile court judges do not order that a summons be issued and hearing set, if the juvenile officer did not request it.
Plaintiffs' allegations against the circuit court as an entity do not state a claim. First, a state court is not a "person" subject to suit under § 1983. Clark v. Clark, 984 F.2d 272, 273 (8th Cir.), cert. denied, 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993). Second, this suit is barred by the Eleventh Amendment to the Constitution of the United States. The Eleventh Amendment prohibits a citizen from suing his own state, directly or through its agencies. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). The court is an agency of the state of Missouri, see Mo. Const., Art. V, § 1 (1945), and suit against it as a unit is barred by the Eleventh Amendment. Robinson v. Court of Common Pleas of Philadelphia County, 827 F.Supp. 1210, 1213 (E.D.Pa.1993). Plaintiffs' claim against the court must be dismissed.
Plaintiffs seek relief against defendant Long as the presiding judge of the circuit court in whom, they allege, is vested the administrative functions of the court and the power to create, change, or leave unchanged the practice or customs of the court. Plaintiffs allege that Long is liable for the actions of the circuit court due to his failure to properly train and supervise the juvenile court personnel and the other judges.
Plaintiffs' claim against defendant Long is not supported by legally sufficient allegations. It is not the judicial duty of a presiding judge of a Missouri state circuit court to train and supervise the other judges of the court in the performance of their duties. Cf., Mo.Rev.Stat. § 478.240.2 (1986). Rather, for reviewing judicial decisions, it is the duty of the appropriate appellate courts of the state to review, in the respective cases, the propriety of the decisions made by the circuit judges.
Plaintiffs also allege that on March 27, 1991, defendant Wiggins signed orders of detention for Joshua and Caleb "pending a hearing upon a Petition (to be) filed in this cause, ..." See Exhs. E and H. On April 11, 1991, Wiggins received written factual allegations and requests from Nelson and the PCDFS and granted the requests by signing the Release From Detention Upon Change In Circumstances. Plaintiffs allege that Wiggins did not give the plaintiffs notice, or the opportunity for a hearing, in violation of their federal constitutional rights.
Plaintiffs further allege that on April 15 and October 21, 1991, defendants Haslag and Sheffield, respectively, filed orders terminating jurisdiction in Joshua's and Caleb's cases. Plaintiffs allege that, without providing the plaintiffs notice or the opportunity for a hearing, these judges found that the subject juvenile "is no longer in need of care and treatment which this Court may provide." See Exhs. L, M. Plaintiffs allege that the judges thereby violated plaintiffs' clearly established constitutional rights.
Plaintiffs' claims against these state court judges, as the facts are alleged by the plaintiffs, are barred by the doctrine of absolute judicial immunity. Judges are absolutely immune from suit for damages arising out of the performance of their judicial duties, such as plaintiffs allege. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); Martin v. Aubuchon, 623 F.2d 1282, 1285 (8th Cir.1980).
In Counts 7 and 8, plaintiffs have failed to state a claim upon which relief can be granted.

Count 9:

April 17, 1991, requirement of hiring counsel.
Plaintiffs allege that the associate division of the Circuit Court of Phelps County has a policy of requiring that all defendants in felony cases be represented by an attorney. Plaintiffs allege that on March 28, 1991, defendant *1394 Sheffield's declaration to plaintiffs of the fraudulent policy of the Circuit Court of Phelps County, Missouri, Associate Division, stated that:
the law requires that all defendants in felony cases be represented by an attorney ....
followed by the order for plaintiffs to appear on April 17, 1991, to obtain the advice of counsel, violated plaintiffs' constitutional rights to represent themselves against any criminal charge and to due process. Under the Sixth Amendment to the Constitution of the United States, persons charged with felony crimes are entitled to the advice of counsel. See Johnson v. Zerbst, 304 U.S. 458, 463, 58 S.Ct. 1019 [1022-23], 82 L.Ed. 1461 (1938); Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792 [795-96], 9 L.Ed.2d 799 (1963). Further, under the Constitution of Missouri a felony defendant, upon request, is entitled to be represented by appointed counsel. See Mo. Const., Art. I, § 18(a).
However, the Sixth Amendment also protects to a criminal defendant the right to conduct his or her own defense, without the advice of counsel, as long as the defendant knowingly and intelligently waives the right to counsel. Faretta v. California, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975). The right to self-representation, however, is not absolute. Self-representation may be refused, if the court determines that the defendant would not follow the court's rules of procedure, McKaskle v. Wiggins, 465 U.S. 168, 173, 104 S.Ct. 944, 948, 79 L.Ed.2d 122 (1984), or could not competently represent himself. United States v. Watson, 1 F.3d 733, 734-35 (8th Cir.1993).
The allegations of the plaintiffs are that they were not afforded the right to represent themselves on the felony charge of child abuse. They make no allegation, and the defendants do not contend otherwise, that they were unable to competently represent themselves on that charge, that they would not follow the court's rules of procedure, or that they could not constitutionally waive their right to counsel. Plaintiffs allege that they requested that the court allow them to represent themselves. There is no allegation that any waiver of their right to counsel was rejected by the court for an appropriate reason. It appears from plaintiffs' allegations that the circuit court was determined that they be represented by counsel on the felony charge against them. Clearly, plaintiffs have alleged a violation of their federal constitutional right to self-representation on the felony charge.
However, the claim against Judge Sheffield is barred by absolute judicial immunity. Plaintiffs' allegations are clear that Judge Sheffield is being sued for her judicial actions performed in the plaintiffs' criminal case. In this respect, the law is clear that she is absolutely immune from suit for damages arising out of her performance of judicial, decision-making duties. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); Martin v. Aubuchon, 623 F.2d at 1285; Malachowski v. City of Keene, 787 F.2d 704, 710 (1st Cir.), cert. denied, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).
Plaintiffs also allege that defendant Russell Carnahan, Esq., acting as an attorney at law and as an officer of the Circuit Court of Phelps County, had the power to prevent the deprivation of plaintiffs' constitutional rights by advising them that the Constitution of the United States and the Constitution of Missouri generally prevent the state from requiring that a criminal defendant be represented by an attorney against his or her will. They allege that, knowing that plaintiffs wanted to represent themselves, attorney Russell Carnahan did not act to prevent the deprivation of plaintiffs' constitutional rights but acted in concert with Sheffield and the unconstitutional policy of the circuit court.
Plaintiffs have failed to state a claim against defendant Russell Carnahan upon which relief can be granted. First, they fail to allege any facts which indicate that he acted under color of state law. This defendant is alleged only to have acted in the capacity of a private, retained attorney, who is admitted to practice before the Circuit Court of Phelps County. These facts, including his bar membership, and his alleged actions do not constitute state action for the *1395 purposes of § 1983. Dunn v. Hackworth, 628 F.2d 1111 (8th Cir.1980).
Plaintiffs also allege that defendants Melvin E. Carnahan, Roger A. Carnahan, and Hickle, in their individual and their official capacities as attorney officers of the Circuit Court are also liable for the actions of defendant Russell Carnahan due to their failure to properly train and supervise him. Clearly, plaintiffs do not allege facts which indicate that these defendants acted under color of state law.
Plaintiffs fail to state a claim in Count 9 upon which relief can be granted.

Count 10:

March 29 failure to return Caleb and April 1 prohibition of plaintiffs taking Caleb on trip.
Plaintiffs allege that the request for detention and the petition filed in Caleb's case stated that the need for an order of detention was that, since the plaintiffs were in jail, there was no one to take care of Caleb. Plaintiffs allege that, therefore, when plaintiffs were released from jail, custody of Caleb should have been immediately returned.[14] Plaintiffs allege that, however, on March 29, 1991, after plaintiffs got out of jail, defendant Nelson refused to let plaintiffs regain the custody of Caleb. Plaintiffs claim that thereby were violated their constitutional rights to freely associate, to exercise freedom of religion, to privacy, to due process, and to exist as a family unit free from unwarranted intrusion by the government.
Plaintiffs allege that on April 1, 1991, after plaintiffs had met with Nelson twice that day and had agreed to all of the requirements laid down by the PCDFS, Nelson unconstitutionally denied plaintiffs custody of Caleb unless they promised to not take him to the convocations.
The allegations of the plaintiffs establish that the liability asserted against defendant Nelson is barred by qualified immunity. From the time Caleb was taken into protective custody until the time the circuit court entered its order terminating the custody and its jurisdiction, defendant Nelson had the authority under Missouri law to supervise the welfare of Caleb. In these circumstances, plaintiffs had no clearly established federal constitutional right to avoid Nelson's decision not to allow plaintiffs to take Caleb on their trip. Cf., Donald M. v. Matava, 668 F.Supp. 703, 709 (D.Mass.1987).
Again, plaintiffs allege that defendant Sheldon is liable for the actions of defendant Nelson due to his failure to properly train and supervise Nelson. This allegation does not state a claim against defendant Sheldon, because Nelson violated no clearly established federal constitutional right of the plaintiffs.

Count 11:

April 1 and July 24 service plans.
Plaintiffs allege that on April 1, 1991, defendants Nelson and Slawson unjustifiably misled plaintiffs into believing that, (a) if plaintiffs did not agree to the terms of a Service Plan, they would not get the custody of Caleb returned; (b) if plaintiffs did not comply with the plan, the juvenile court may terminate the plaintiffs' parental rights to Caleb; and (c) the juvenile court was requiring the implementation of the Service Plan as a condition for the return of custody of Caleb to the plaintiffs. See Exhs. J and N.
Plaintiffs also allege that on April 11, 1991, Circuit Judge Wiggins' order returned physical custody of Caleb to the plaintiffs, "under the continued supervision and jurisdiction of the court," without first conducting an adjudicatory hearing on the allegations in the petition. Plaintiffs allege that, therefore, the court did not have or obtain jurisdiction to order that plaintiffs' custody of Caleb be under the "continued supervision and jurisdiction of the court." Because the court did not have jurisdiction by conducting a hearing on the petition, Nelson and Slawson had no legal authority to impose any dispositional treatment or service plan upon the plaintiffs and to threaten the plaintiffs with the possible termination of their parental rights for non compliance to the Service Plan.
*1396 Plaintiffs allege that the court ordered supervision without jurisdiction and the requirement of plaintiffs' participation in a service plan with the PCDFS violated plaintiffs' constitutional rights to privacy, to due process, and to exist as a family unit free from unwarranted intrusion by the government.
Plaintiffs allege that, after successfully completing the terms of the April 9, 1991 service plan, on July 24, 1991, under threat of termination of parental rights, and without having an adjudicatory hearing on the petition to obtain jurisdiction to continue to supervise the plaintiffs, Slawson and Nelson required plaintiffs to execute a second service plan.
The Court agrees with defendants that they are protected from liability for damages, under plaintiffs' allegations, on account of qualified immunity. Cf., Donald M. v. Matava, 668 F.Supp. 703, 709 (D.Mass.1987).
In spite of invoking the protection of the federal Constitution, plaintiffs have no more than alleged facts which indicate that these defendants, circuit court juvenile officers, were performing their job in a manner to which the plaintiffs took exception, during a period of time in which the circuit court had jurisdiction of Caleb and these defendants had responsibility for Caleb's welfare.
The circuit court had jurisdiction over the boys from the time they were taken into protective custody. See Mo.Rev.Stat. § 210.125.3 (1986). Not sitting in appellate review of the actions of these juvenile court officers or of the orders which empowered them, this Court must conclude that plaintiffs' allegations show that these defendants violated no clearly established constitutional right of the plaintiffs.
Plaintiffs allege that defendant Langston is liable for the actions of defendant Slawson, that defendant Sheldon is liable for the actions of defendant Nelson, and that defendant Long is responsible for the actions of defendant Wiggins, all due to their failure to properly train and supervise their respective subordinates, Slawson, Nelson, and Wiggins. Plaintiffs' allegations have failed to indicate that defendants Slawson, Nelson, and Wiggins have violated any clearly established federal right of the plaintiffs. For this reason, plaintiffs have failed to state a claim upon which relief can be granted against defendants Long, Langston and Sheldon.

State law claims.
This Court having determined that plaintiffs have failed to state a claim upon which relief can be granted under 42 U.S.C. § 1983 against any of the defendants, and there being no federal law claim which survives the defendants' motions to dismiss, the Court will decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claim under Missouri state law. United Mine Workers of America v. Gibbs, 383 U.S. 715, 728, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966).

Conclusion.
For the reasons set forth above, the motions of the defendants to dismiss the action must be sustained. An appropriate Order dismissing the action with prejudice is issued herewith.
NOTES
[1] Unless otherwise indicated, all references and citations to exhibits in this opinion are to documents attached to plaintiffs' complaint. Each of these exhibits is a part of the complaint for all purposes. Fed. R. Civ. Pro. 10(c).
[2] The Missouri Division of Family Services is a Missouri state agency, part of the Department of Social Services. See Mo.Rev.Stat. § 207.010 (1986). Among the duties of the Missouri Division of Family Services is the execution and administration of state laws concerning child welfare. See Mo.Rev.Stat. § 207.020, esp. (5), (10) (1986).
[3] The Missouri Division of Family Services establishes an office in each county, headed by the county's welfare director. See Mo.Rev.Stat. § 207.060 (1986).
[4] Plaintiffs allege that defendant Carl James operates a dental office in Rolla but acted in concert with chief deputy Juvenile Officer Donald Nelson.
[5] The record does not indicate that plaintiffs appealed any orders or determinations of the circuit court.
[6] Citations are made to Missouri statutory law in effect when the alleged events occurred.
[7] Merely being the employment superior of an alleged defendant is not sufficient to establish liability under § 1983, because the doctrine of respondeat superior does not apply in such cases. Myers v. Morris, 810 F.2d 1437, 1464 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987).
[8] Plaintiffs allege that by the time this action was commenced, Keith Wheeler had died and was for this reason not sued as a defendant with Charlene Wheeler, his wife. See Complaint at ¶ 191.
[9] Plaintiffs make no allegation that these defendants hold any official governmental position. The facts alleged by plaintiffs allow an inference that these defendants act in the nature of foster parents for the PCDFS.
[10] Plaintiffs' allegation that Nelson told them that Joshua was not in protective custody, see Complaint ¶ 96(B), does not detract from the other alleged actions which clearly indicate that Joshua was taken into protective custody.
[11] In their complaint, plaintiffs do not identify the "unnamed employees" of the high school other than to allege that they acted only as assistant principal Berkbuegler acted. See Complaint at ¶ 81.
[12] No defendant has entered this action as one of the "unnamed employees" of the Rolla High School and no motion to dismiss has been filed on behalf of any such defendant. Therefore, the Court will dismiss the claims of the plaintiffs against these defendants for lack of personal jurisdiction. See Fed.R.Civ.P. 12(b)(2). Because the Court determines, under plaintiffs' allegations, for the reasons set forth with respect to the allegations against defendant Berkbuegler, that plaintiffs have not stated a claim against these defendants. See Fed.R.Civ.P. 12(b)(6).
[13] Mo.Rev.Stat. § 211.101.1 (1986) provided:

After a petition has been filed, unless the parties appear voluntarily, the juvenile court shall issue a summons in the name of the state of Missouri requiring the person who has custody of the child to appear personally and, unless the court orders otherwise, to bring the child before the court, at the time and place stated.
[14] This position overlooks the other allegation in the petition respecting Caleb, i.e., that plaintiffs were charged with child abuse and that they were not suitable to provide proper care for Caleb.